# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| E.O. and L.J., and K.O. and E.O., Jr. by and through their parents and next friends, E.O. and L.J.; F.C., and C.J by and through his father and next friend F.C.; each individually and K.O., E.O., Jr., and C.J. on behalf of all others similarly situated, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| UNITED STATES OF AMERICA, | ) ) |
| Defendant. | ) ) |

CIVIL ACTION NO.
4:20-12015-TSH

_____

## FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

### Introduction

1.     The United States of America was founded on the bedrock principle that our nation is a beacon of hope to people everywhere seeking refuge from poverty, persecution, and violence.  Emma Lazarus's sonnet on the Statue of Liberty famously rings out: "Give me your tired, your poor, your huddled masses yearning to breathe free."  Defendant has betrayed this fundamental principle and the constitutional rights that protect everyone within the territory of the United States regardless of citizenship.  In doing so, Defendant has harmed those most vulnerable: children.  Through this lawsuit, Plaintiffs, on behalf of themselves and a class of similarly situated children, seek to hold Defendant accountable for its actions in accordance with the rule of law.

2.     Plaintiffs seek damages and the establishment of a fund for the mental health treatment of all class members to remedy the harm caused by the Defendant's: (i) forcible separation of thousands of children from their parents in immigration detention with no legal

justification and without their consent; (ii) seizing those children and separating them from their parents without any legal basis for unreasonable lengths of time; and (iii) inflicting emotional and psychological harm to deter immigration, particularly from Central and South American countries.  Many of these children and their parents, including the Plaintiffs in this case, fled their native countries to lawfully seek asylum upon arriving in the United States.

3.      Defendant forcibly separated these young children from their parents without any allegations of abuse, neglect, or parental unfitness, in an abusive and intolerable manner, without legal proceedings or hearings of any kind.  Once separated, Defendant withheld the children from the care and custody of their parents even though all were held in immigration detention. Defendant detained these young, terrified children in facilities often thousands of miles from their parents.

4.      Defendant chose to keep immigrant children from the care and custody of their parents and, even where both child and parent remained in immigration detention, refused opportunities to hold them together in their existing immigration family detention centers.

5.      Defendant's employees' unilateral conduct created a crisis that victimized non-citizen children.  In many instances, they separated children from their parents even where the parents were never charged with a crime. In other cases, Defendant's employees referred parents for criminal prosecution for the misdemeanor offense of illegal reentry under 8 U.S.C. § 1325(a), then separated the parents from their children, and even after the parents were released to immigration custody continued to keep the families separated for unreasonable lengths of time and with no justification for doing so.  Defendant also unlawfully and unnecessarily categorized the children, who arrived and were held in immigration detention initially with their parents, as

"unaccompanied," utilized horrific methods to effectuate their separation, and sent them to separate immigration detention facilities.

6.      Forced separation of children from their parents causes severe and often permanent emotional and psychological harm, particularly when those children and parents are already traumatized from fleeing violence and persecution in their home countries.

7.      Defendant's continued separation and unreasonable refusal to reunite these children with their parents, even after their parents returned to immigration detention or were released from custody, prolonged and significantly increased the trauma visited by the Defendant upon these children and their parents.

8.      Based on Defendant's employees' conduct, the United States government is liable for the torts of intentional and negligent infliction of emotional distress, negligence, false imprisonment, false arrest, assault and battery, and for the loss of consortium that the minor Plaintiffs and parent Plaintiffs have suffered as a result of the harm caused to their parents and children by Defendant's conduct.  Plaintiffs presented tort claims to the appropriate federal agencies under the Federal Tort Claims Act more than six months ago, yet the appropriate federal agencies have failed to make final disposition of such torts claims. *See* 28 U.S.C. § 2675.

## Parties

9.      Plaintiff K.O. brings this lawsuit through her parents and next friends, E.O. and L.J., as a result of her incapacity due to her minor status.  K.O. is now 13 years old.

10.      Plaintiff E.O., Jr. is K.O.'s brother and he originally brought this lawsuit through his parents and next friends, E.O. and L.J., as a result of his incapacity due to his minor status. E.O., Jr. is now twenty-one years old.

11.    Plaintiffs E.O. and L.J. bring this lawsuit as individuals and as parents and next friends to their children, K.O. and E.O., Jr.

12.    Plaintiff E.O., Plaintiff L.J., and their children, Plaintiffs K.O. and E.O., Jr., all reside in Westborough, Worcester County, Massachusetts.  They are all seeking asylum in the United States and fleeing violence and persecution in Guatemala.

13.    Plaintiff C.J. brings this lawsuit through his father and next friend, F.C., as a result of his incapacity due to his minor status.

14.    Plaintiff F.C. brings this lawsuit as an individual and as parent and next friend to his son, C.J.

15.    Plaintiff F.C. and his son, Plaintiff C.J., reside in Westborough, Worcester County, Massachusetts.  They are seeking asylum in the United States and fleeing violence and persecution in Guatemala.

16.    Plaintiffs E.O., L.J., and F.C bring this action on their own behalf

17.    Plaintiffs K.O, E.O., Jr., and C.J. bring this action on their own behalf and on behalf of all other children similarly situated nationwide.

18.    Defendant United States of America, acting through the Department of Justice ("DOJ"), individuals in the White House Office, the Department of Homeland Security ("DHS"), and Department of Health and Human Services ("HHS"), "federal agencies" of the United States under 28 U.S.C. § 2671, and their employees, officers, and agents, is the appropriate Defendant under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671, et seq.

19.    At all relevant times, the Defendant's agents and employees have acted under color of federal law in the course and scope of their duties and functions as agents, employees, and officers of the United States in engaging in the conduct described in this Complaint. At all

relevant times, Defendant's agents and employees referenced in this Complaint who interacted with the Plaintiffs were acting as investigative or law enforcement officers. 28 U.S.C. § 2680(h).

20.     The United States of America is sued for Plaintiffs' personal injuries caused by the negligent or wrongful acts or omissions of its agents and employees.  Defendant's employees were acting within the scope of their office or employment under circumstances where the United States, if a private person, would be liable to Plaintiffs in accordance with the common law. *See* U.S.C. §§ 1346(b), 2674.

## Jurisdiction and Venue

21.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1346(b) and 2675.

22.     This Court has personal jurisdiction over Defendant under 28 U.S.C. § 1391(e), and Fed. R. Civ. P. 4(k)(1)(C); in that the United States is subject to nationwide service of process within the United States, and such process has actually been served.

23.     Venue is proper in this District under 28 U.S.C. § 1402(b), because, among other things, Defendant is subject to personal jurisdiction in this District, named Plaintiffs reside in this district, and a substantial part of the events or omissions giving rise to the claim occurred within this District.

24.     Plaintiffs have fulfilled their presentment obligations under the FTCA by serving written notices to the relevant federal agencies and waiting the requisite six months to file this Complaint.  Plaintiffs K.O., E.O., Jr., and C.J. ("Plaintiff children") sent their original written notices to the relevant agencies on October 9, 2018, then resent the original notices with certified mail return receipts on October 15, 2018.  On November 20, 2018, DHS responded, demanding that Plaintiff children's names and other identifying information be included in the notices. Accordingly, Plaintiff children sent their first amended notices, including Plaintiff children's

names, on March 13, 2020.  Plaintiffs then sent a second amended notice on July 7, 2021,

supplementing their prior notices with claims directly on behalf of L.J., E.O., and F.C. ("Plaintiff

parents").  Now, after more than six months has passed since the agencies received the notices

and amended notices, the FTCA claims are ripe for adjudication.

## Facts

### Legal Framework Under Federal Immigration Law

25.     Pursuant to Section 208(a)(1) of the Immigration and Nationality Act ("INA"),

"[a]ny alien who is physically present in the United States or who arrives in the United States

(whether or not at a designated port of arrival and including an alien who is brought to the United

States after having been interdicted in international or United States waters)" may generally

apply for asylum "irrespective of such alien's status." *See* 8 U.S.C. § 1158(a)(1).  The INA and

its accompanying regulations establish procedures for the adjudication of asylum claims.  *Id*; *see*

*also* INA § 235(b), 8 U.S.C. § 1225(b); 8 C.F.R. §§ 208.1-208.31.

26.     Even individuals who initially fall within the INA's "expedited removal"

procedures, meaning they would bypass formal removal proceedings, are entitled to pursue

asylum once the person indicates an intention to apply for asylum and demonstrates a credible

fear of persecution at an interview before an asylum officer.  8 U.S.C. §§ 1225(b)(1)(A)(i),

1225(b)(1)(B); 8 C.F.R. §§ 235.1-235.13.

27.     The January 1997 settlement agreement in *Flores v. Reno*, 85-cv-4544 (C.D. Cal.)

governs the detention and release of "alien" children.  The *Flores* Settlement remains binding on

federal agencies, including DHS, HHS, and all respective agency components, such as ICE,

CBP, USCIS, and ORR.  In 2008, Congress enacted the Trafficking Victims Protection

Reauthorization Act ( "TVPRA"), Pub. L. 110-457, 110 Stat. 5044 (2008), which paralleled

certain aspects of the *Flores* Settlement and affirmed ORR's responsibility for the care, release, and custody of unaccompanied minors.

28.     The *Flores* Settlement and its progeny, including the statutory rights and obligations within the TVPRA, provide a "nationwide policy for the detention, release, and treatment of minors in the custody of INS [which is the predecessor to ICE, CBP, and USCIS]," which requires the government to treat "all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors." Exhibit 1, *Flores* Settlement ¶¶ 9-11; *see* 8 U.S.C. § 1232.  A "minor" is "any person under the age of eighteen (18) years who is detained in the legal custody of the INS." *See id*. ¶ 4; 8 U.S.C. § 1232(g)(2); *Flores v. Lynch*, 828 F.3d 898, 905-06 (9th Cir. 2016).

29.     Paragraph 14 of the *Flores* Settlement requires that "[w]here the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay." Exhibit 1, *Flores* Settlement ¶ 14. Paragraph 14 also sets forth the "order of preference" for the release of a child and release to a parent is preferred. *Id*.

30.     Critically, the *Flores* Settlement requires the federal government to "place each detained minor in the **least restrictive setting** appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others." Exhibit 1, *Flores* Settlement ¶ 11 (emphasis added); 8 U.S.C. § 1232(c)(2)(A).

31.     Under the *Flores* Settlement, children must be released from detention within five days, or within twenty days in certain emergency circumstances, to a parent, legal guardian, adult

relative, adult designated by a legal guardian, or (if none of these are available) a licensed program willing to accept legal custody. *Id.* ¶¶ 12, 14.

32.     An "unaccompanied alien child" ("UAC") is a child under 18 years of age with no lawful immigration status who has neither a parent nor a legal guardian in the United States "available" to care for them. 6 U.S.C. § 279(g)(2).  According to the TVPRA, a UAC "may not be placed with a person or entity unless the Secretary of Health and Human Services makes a determination that the proposed custodian is capable of providing for the child's physical and mental well-being.  Such determination shall, at a minimum include verification of the custodian's identity and relationship to the child, if any, as well as an independent finding that the individual has not engaged in any activity that would indicate a potential risk to the child." 8 U.S.C. § 1232(c)(3)(A).

33.     The statute sets forth a process for DHS, usually through ICE or CBP, for the detention and release of UACs.  8 U.S.C. § 1232(b)(3).  ICE or CBP may detain an unaccompanied child for up to 72 hours as other federal agencies locate an appropriate facility for that child.  *Id.*  ICE or CBP must then turn the child over to HHS.  *Id.*

34.     Once ORR detains a UAC, he or she is typically supervised and placed in ORR-funded and supervised facilities, where staff must attempt to locate a parent and determine if family reunification is possible.  *See generally* 8 U.S.C. §§ 1232(c)(2)-(c)(3).  If that is not the case, ORR staff will try to locate another family member, relative, family friend, or caretaker in the United States to serve as a sponsor who can care for the child during the pendency of the child's immigration proceedings.  *Id.*

35.     When ORR cannot find a sponsor, the unaccompanied child is moved to secondary ORR-contracted and state-licensed facilities throughout the country.  *Id.*  If DHS

places the child in removal proceedings or the child has an affirmative pathway to legal immigration status, ORR will place the child in an ORR-contracted and state-licensed long-term foster care program while the immigration process continues.  *See* 8 U.S.C. § 1232(a)(5)(D).

### Defendant's Forcible Separation of Children from their Parents While in Immigration Detention

36.     In 2017, the Defendant's employees began forcibly separating thousands of migrant children from their families while in immigration detention, in an abusive manner and without the parents' or children's consent, for no legitimate purpose.  The children accompanied their parents to the United States.  For the first time ever, Defendant engaged in a widespread practice of separating children from their parents, in many cases even where the parents were not charged with a crime. Defendants also engaged in a widespread practice of prosecuting or referring for prosecution the parents for illegally reentering the county, a federal misdemeanor offense. *See* 8 U.S.C. § 1325(a).

37.     Defendant prosecuted or referred many parents for prosecution, knowing that it would cause the parents to be separated from their children while the parents were transferred to federal criminal custody.

38.     In the vast majority of cases, if not all of them, the parents were transferred to federal criminal custody, plead guilty to the criminal offense, were given a sentence of time served, and transferred back to civil immigration custody.

39.     In the meantime, their children remained seized, designated as UACs, and not afforded counsel, process, or notice of their parents' whereabouts.  They were often transferred to the custody of ORR at child detention centers thousands of miles away from the place where they were separated from the parents.

40.     Once the children's parents were released from their brief criminal detention and were released or subject to civil immigration detention, Defendant's employees withheld the children from their parents' care and custody by detaining them in separate detention facilities throughout the United States.

41.     Rather than reuniting the children with their parents in civil immigration custody, Defendant's employees continued their separation and withheld the children from their parents' care, custody, and control.

42.     The children were separated from their parents indefinitely without due process to challenge their seizure and indefinite separation in violation of the Constitution.  Defendant's employees engaged in this conduct to demonstrate the agony that parents should expect to experience they dare to enter the United States without authorization with their children.

43.     Defendant's conduct forced and coerced parents and their children to separately make important legal decisions regarding their potential claims for asylum, and other efforts to defend against removal to their home countries.

44.     As early as March 2017, a senior DHS official acknowledged that Defendant was considering forcibly separating children from their parents at the Southwestern border.  M. Mallonee, *DHS Considering Proposal to Separate Children from Adults at Border*, March 4, 2017, available at https://www.cnn.com/2017/03/03/politics/dhs-children-adults-border/index.html.

45.     On March 7, 2017, then-Secretary of DHS John F. Kelly, who later became White House Chief of Staff, confirmed that DHS was considering forcibly separating children from their parents "to deter more movement."  D. Diaz, *Kelly: DHS Considering Separating Undocumented Children from their Parents at the Border*, March 7, 2017, available at

10

https://www.cnn.com/2017/03/06/politics/ john-kelly-separating-children-from-parents-immigration-border/index.html . While Kelly later backtracked after harsh criticism, an inside source reported to the press that the family separation proposal was still under consideration by Defendant's employees at DHS as of August 2017. J. Blitzer, *How the Trump Administration Got Comfortable Separating Immigrant Kids from their Parents*, The New Yorker, May 30, 2018, available at https://www.newyorker.com/news/news-desk/how-the-trump-administration-got-comfortable-separating-immigrant-kids-from-their-parents.

46.     In fact, Defendant's employees at DHS began separating children from their parents in secret in the El Paso section of the border in West Texas from July to November 2017. D. Lind, *Trump's DHS is Using an Extremely Dubious Statistic to Justify Splitting Up Families at the Border*, Vox, May 8, 2018, available at https://www.vox.com/policy-and-politics/2018/5/8/17327512/sessions-illegal-immigration-border-asylum-families.

47.     The forced separation of families continued well into 2018 and took place without a hearing or any process whatsoever, regardless of the family's circumstances or the needs of the children. It also occurred regardless of where or how the family entered, whether they sought asylum, whether they were charged with the crime of unlawful entry or whether a family member had passed a credible fear interview under federal asylum law.

48.     United States Attorneys working along the Texas border have reported that, in May 2018, they received instruction from then Attorney General Sessions that "[w]e need to take away children." According to a report by the Office of the Inspector General ("OIG"), "Sessions and a small number of other DOJ officials understood that DHS would change its policy in response to the zero tolerance policy and begin referring to DOJ for criminal prosecution adults who entered the country illegally with children and that prosecution of these family unit adults

would result in children being separated from them, at least temporarily."  U.S. Dept. of Health & Human Services, Office of Inspector General, *Review of the Dept. of Justices Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Depts. Of Homeland Security and Health and Human Services*, 21-028 (Jan. 2021), available at https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf .

49.     Defendant has taken children as young as infants from their parents, often with no warning or opportunity to say goodbye, and with little to no information provided about where Defendant's employees were taking the children or when they would next see their parents.

50.     Most of these migrant families fled their home countries to lawfully seek asylum once physically present in the United States.  *See* 8 U.S.C. § 1158(a)(1).

51.     Nevertheless, without any allegations that the parents are unfit or abusive, the Defendant's employees forcibly separated these asylee-seeking parents from their young children, who were derivative applicants on their parents' applications and detained them, often thousands of miles away from their parents.

52.     The government separated families without providing notice to the parents or children of each other's whereabouts or well-being and refused to reunite these families, without any legal basis for doing so.

53.     Government officials have torn some children from the arms of their parents while crying and pleading not to be taken away.

54.     In other cases, government officials have told children they were going to play with other children, but after separating the children from their parents they were not returned.

55.     In some cases, the parents were falsely told that they would be going to court only to be taken to a different detention cell, separated from their children.  They were then

transported to a different detention center without the opportunity to say goodbye to their children or to explain that they would not see each other for some time.

56.     Many parents were told the children would be "adopted" and they would not see their children again.

57.     Many parents were deported without their children.

58.     During the separation, parents and children were often prevented from communicating for weeks or longer, and even when allowed to communicate typically children could only communicate with a parent by telephone for a few short minutes and were not permitted to talk about where they were being held.  These phone calls were closely monitored. In the detention facilities where they were kept, children were not allowed to touch each other. While staff at many detention facilities were permitted to hold the youngest children, they were instructed not to hold or touch older children.

59.     Additionally, in some of the makeshift detention centers children were held in areas with no beds or mattresses.  Some of the children were subjected to abuse by those working at the detention centers.

60.     Medical care at the detention centers was often grossly inadequate, even leading to the death of a one-year old child who developed a respiratory infection at an immigration jail in Texas.  The child was turned away twice by the facility's health clinic, the treatment she received may have exacerbated the condition given her age, and she was cleared for release without a medical examination.  The child then spent six weeks in two hospitals before dying from bronchiectasis, pulmonitis, pneumothorax, or collapsed lung.  M. Sacchetti, *Mother blames toddler's death on poor medical care in U.S. immigration jail*, Washington Post, August 28, 2018, available at https://wapo.st/2PJRMv5?tid=ss_mail&utm_term=.3dddd9b5a241.

61.     These conditions of confinement further traumatized the children separated from their parents and traumatized the parents who were separated from their children.

62.     Under HHS Secretary Alex Azar's direction, HHS would not allow media cameras into facilities housing immigrant children separated from their parents.  Yet Azar claimed, incredibly, that "[w]e have nothing to hide about how we operate these facilities" and that "[i]t is one of the great acts of American generosity and charity, what we are doing for these unaccompanied kids who are smuggled into our country or come across illegally." M. Rod, *HHS Secretary: We're Performing Great Act of "Generosity and Charity" for Immigrant Children*, July 10, 2018, available at https://www.cnn.com/2018/07/10/politics/azar-hhs-child-separation-immigration-charity-cnntv/index.html.

63.     Suddenly ripping children away from their parents and forcibly keeping them separated for unconscionable lengths of time is conduct that shocks the conscience, bespeaks a callous disregard for the human beings in HHS's care, and demonstrates the discriminatory animus behind these practices.

64.     Attempts by parents to be reunited with their children were unlawfully delayed and made unnecessarily cumbersome as a result of the Defendant's deliberate decision to classify the children as "unaccompanied minors," even though they entered the United States with their parents.  This classification meant that parents had to go through a lengthy and complex process to apply to be a "sponsor" of their own children in order to be reunited.  This exacerbated the harm done by the separation by prolonging it and transforming reunification into an unnecessarily arduous journey through a labyrinth of government bureaucracy.

65.     At least one HHS official has stated that "[w]hat went wrong is the children separated from their parents were referred as unaccompanied alien children when in fact they

were accompanied."  N. Miroff & K. Memirjian, *Senate Panel Skewers Trump Officials Over Migrant Family Separations*, Wash. Post, July 31, 2018, available at https://www.washingtonpost.com/world/national-security/lawmakers-to-question-trump-officials-on-migrant-family-separations-struggle-to-reunite-them/2018/07/31/ddb61390-9467-11e8-8ffb-5de6d5e49ada_story.html?utm_term=.27575f06d9ea.

66.    During his tenure, former ORR Director Scott Lloyd has effectively transformed ORR from an agency designed to care for the health and well-being of migrant children into what former ORR Director Robert Carey has called "a juvenile detention agency."  R. Planas, *A Single Trump Appointee Was Responsible for Keeping Hundreds of Kids Locked Up Longer*, HuffPost, July 26, 2018, available at https://www.huffingtonpost.com/entry/scott-lloyd-refugee-resettlement_us_5b58cd0fe4b0fd5c73cb3c1a.  This was due in part to Director Lloyd's insistence in June 2017, at a time when the forced separation of families was under consideration, that he personally review and approve release decisions involving unaccompanied minors housed in staff-secure facilities.  This led to extensive delays in the release of certain minors in ORR custody.  *Id*.  A federal judge enjoined that practice in June 2018, ruling that the plaintiffs demonstrated a likelihood of success on the merits of their claims that the practice violated the Administrative Procedure Act and TVPRA.  *L.V.M. v. Lloyd*, 2018 WL 3133965 (S.D.N.Y. June 27, 2018).

67.    Director Lloyd's intentional delays exacerbated ORR's ability to process the thousands of children separated from their parents by the Defendant.  Under Director Lloyd's leadership, ORR was unequipped to handle the influx of "unaccompanied" minors, and Director Lloyd deliberately failed to improve the situation until ordered to do so by a federal judge in California last summer.

**Defendant's "Zero Tolerance Policy" Served as a Pretext to Continue Separating Families**

68.     On April 6, 2018, then Attorney General Jefferson Beauregard Sessions III announced the Trump Administration's so-called "zero-tolerance policy" for illegal entry into the United States in violation of 8 U.S.C. § 1325(a) as a pretext for these family separations.  In reality, Defendant had been forcibly separating children from their parents long before the "zero-tolerance policy" was announced.  The express purpose of the family separation was to deter immigration to the United States by instilling fear in migrants, particularly those from South and Central American countries.  That conduct—forcibly separating families on the basis of race or national origin—violates the United States Constitution and state tort law.

69.     After General Sessions' announcement, former ICE Director Thomas Homan, then USCIS Director L. Francis Cissna, and then CBP Commissioner Kevin K. McAleenan signed onto a letter to then DHS Secretary Kirstjen Nielsen urging her to detain and refer for prosecution all parents caught crossing the Mexican border illegally with their children.  In other words, Homan, Cissna, and McAleenan pushed for the across-the-board implementation of the Justice Department's "zero-tolerance policy" at DHS to serve as a pretext for continuing the Defendant's forcible separation of immigrant children from their parents while in immigration detention at the Southwestern border.  M. Sacchetti, *Top Homeland Security Officials Urge Criminal Prosecution of Parents Crossing Border with Children*, Washington Post, April 26, 2018, available at https://www.washingtonpost.com/local/immigration/top-homeland-security-officials-urge-criminal-prosecution-of-parents-who-cross-border-with-children/2018/04/26/a0bdcee0-4964-11e8-8b5a-3b1697adcc2a_story.html?utm_term=.655fc386e41a.

70.     According to a letter authored by 17 United States Senators in April 2018, under Director Homan's leadership, ICE "sharply increased arrests and detentions of immigrants with no criminal background" and "[r]eportedly separated hundreds of children of asylum-seekers from their parents," among other things.  April 27, 2018 Letter from Sens. to Sec. K. Nielsen, available at https://www.murray.senate.gov/public/index.cfm/2018/4/immigration-senator-murray-raises-questions-about-nomination-of-tom-homan-to-head-immigration-and-customs-enforcement.

71.     Importantly, these statements distinguish between the "zero-tolerance policy" and Defendant's unnecessary and unlawful conduct in forcibly separating children from their families while they were held in immigration detention.  That conduct pre-dated and post-dated the "zero-tolerance policy."  And it occurred even in cases where the parents were never charged with a crime.

72.     Defendant's employee Secretary Nielsen as well as President Trump have also made statements demonstrating that distinction.

73.     Secretary Nielsen put out the following statement on Twitter on June 17, 2018: "We do not have a policy of separating families at the border.  Period."  *See* Sec. Kirstjen Nielsen (@SecNielsen), Twitter, https://twitter.com/secnielsen/status/1008467414235992069?lang=en.

74.     In testimony before the House Judiciary Committee on December 20, 2018, Secretary Nielsen again stated:  "[W]e've never had a policy for family separation."  *See, e.g.*, D. Clark, *DHS Chief Nielsen Defends Immigration Policies in Heated Hearing*, NBC News (Dec. 20, 2018), available at https://www.nbcnews.com/politics/congress/i-am-not-liar-dhs-chief-nielsen-defends-immigration-policies-n950511.

17

75.     On June 20, 2018, President Trump issued an Executive Order stating, in part,

that "[i]t is . . . the policy of this Administration to maintain family unity, including by detaining

alien families together where appropriate and consistent with law and available resources."

Exec. Order No. 13841, 83 Fed. Reg. 122 (June 25, 2018), available at

https://www.govinfo.gov/content/pkg/FR-2018-06-25/pdf/2018-13696.pdf.

76.     The President's Executive Order said nothing, however, about reuniting the

families who had already been separated or compensating them for the trauma that the Defendant

put these families through.  Moreover, it took weeks to reunite most of the parents and children

and even today not all of these families have been reunited, in some cases because the parents

were deported while their children remained detained in the United States.

77.     After issuing the Executive Order, President Trump repeatedly emphasized the

lawless nature of the Defendant's employees' approach.  President Trump proposed that DHS

simply deport immigrants without a hearing or any legal process whatsoever.  On June 21, 2018,

President Trump stated: "We shouldn't be hiring judges by the thousands, as our ridiculous

immigration laws demand, we should be changing our laws, building the Wall, hire Border

Agents and Ice and not let people come into our country based on the legal phrase they are told

to say as their password."  *See* President Donald J. Trump (@realDonaldTrump), Twitter,

https://twitter.com/realdonaldtrump/status/1009770941604298753?lang=en.

78.     President Trump again proposed a lawless approach on June 24, 2018:  "We

cannot allow all of these people to invade our Country.  When somebody comes in, we must

immediately, with no Judges or Court Cases, bring them back from where they came.  Our

system is a mockery to good immigration policy and Law and Order.  Most children come

without parents…"  K. Rogers & S. Gay Stolberg, *Trump Calls for Depriving Immigrants Who*

18

*Illegally Cross Border of Due Process Rights*, N.Y. Times, June 24, 2018, available at

https://www.nytimes.com/2018/06/24/us/politics/trump-immigration-judges-due-process.html.

79.     These are but a few examples of the torrent of such statements that came from the

President and other officials in the Trump Administration who either echoed these statements or

acted in accordance with them.

**Defendant's Forcible Separation of Children from their Parents While in Immigration
Detention was Motivated by Discriminatory Animus and an Express Intent to Deter Lawful
Immigration to the United States by Instilling Fear in Would-be Migrants**

80.     Defendant's employees referenced herein and others in the Trump Administration

have openly admitted that the forcible separation of families in immigration detention at the

Southwestern border was intended to target immigrants by their race, ethnicity, or national

origin. The forcible separation of these families is also consistent with the racist and xenophobic

hostility shown toward Latino immigrants, repeatedly voiced and demonstrated by President

Trump and carried out by his Administration, including the Defendant's employees in this case.

81.     For example, in June 2015, when then-candidate Trump announced his campaign

at Trump Tower, he declared:  "When Mexico sends its people, they're not sending their best. . .

. They're bringing drugs.  They're bringing crime.  They're rapists."  Z. Byron Wolf, *Trump

Basically Called Mexicans Rapists Again*, available at

https://www.cnn.com/2018/04/06/politics/trump-mexico-rapists/index.html.  In that speech, Mr.

Trump proposed building a wall along the Southwestern border and making Mexico pay for it.

President Trump has repeatedly referred to Mexicans as "criminals" and "thugs."

82.     In January of 2018, President Trump referred to El Salvador, Haiti, and African

countries generally as "shithole countries" and said that the United States should be allowing

immigration from countries like Norway instead.  E. O'Keefe & A. Gearan, *Trump, Condemned

for "Shithole" Countries Remark, Denies Comment But Acknowledges "Tough" Language*,

Washington Post, Jan. 13, 2018, available at https://www.washingtonpost.com/politics/trump-acknowledges-tough-language-but-appears-to-deny-shithole-remark/2018/01/12/c7131dae-f796-11e7-beb6-c8d48830c54d_story.html?utm_term=.4e58b8638236.   The racism behind that statement is self-evident.

83.     President Trump has impugned the integrity and independence of federal District Judge Gonzalo Curiel because, Trump said, Judge Curiel was of Mexican descent and "very hostile" to Trump because Trump was "very, very strong on the border."

84.     Former United States House Speaker Paul Ryan appropriately rebuked these outrageous statement, describing them as "the textbook definition of a racist comment."  D. Walsh & M. Raju, CNN, June 7, 2016, available at https://www.cnn.com/2016/06/07/politics/paul-ryan-donald-trump-racist-comment/index.html.

85.     President Trump's clear animus based on race, ethnicity, and national origin provides the context for understanding the unlawful and irrational actions of Defendant in this case.  The driving force behind the Defendant's forcible separation of immigrant families along the Southwestern border while in immigration detention was this very animus based on race, ethnicity, and national original, which led to a failure to adhere to the well-established constitutional and statutory rights of Plaintiffs and the class.  Each of the Defendant's employees referenced herein adopted, implemented, enforced, condoned, sanctioned, acquiesced to, and encouraged these forced family separations with the purpose of discriminating against immigrants based on their race, ethnicity, or national origin.  Such intentional discrimination on these bases is unconstitutional.

86.     What is more, Defendant's employees referenced herein and others in the Trump Administration have made clear that the express purpose of the forced separation of children

from their parents was to deter immigrants, particularly from Central and South American countries, from coming to the United States. The vast majority of immigrants at the Southwestern border are from Central and South American countries and are Latino.

87.     During a press interview in May of 2018, Secretary Kelly said that "a big name of the game is deterrence" when asked whether he was in favor of forced family separation. He said family separation "would be a tough deterrent. A much faster turnaround on asylum seekers." Kelly dismissively stated that the traumatized children "will be taken care of—put into foster care or whatever." *Transcript: White House Chief of Staff John Kelly's Interview with NPR*, National Public Radio, May 11, 2018, available at https://www.npr.org/2018/05/11/610116389/transcript-white-house-chief-of-staff-john-kellys-interview-with-npr.

88.     On June 6, 2018, ICE Director Homan made the deterrence goal plain when he stated: "One thing you got to remember, for that parent who was arrested and his child crying and feeling bad about it, I get it, but what responsibility does he have in this? He chose to enter the country illegally in violation of federal law. He chose to do that intentionally. . . . He put himself in the position." C. Da Silva, *ICE Chief Defends Separating Families at Border After U.N. Condemns Practice as Rights Violation*, Newsweek, June 6, 2018, available at https://www.newsweek.com/ice-chief-defends-separating-families-border-after-un-condemns-practice-rights-960825.

89.     Defendant's employee, Senior Advisor to the President of the United States Stephen Miller, was a driving force behind the Defendant's forcible separation of families in immigration detention. Mr. Miller has embraced family separation and explained that "[t]he message is that no one is exempt from immigration law." C. Danner, *Separating Families at the*

*Border Was Always Part of the Plan*, June 17, 2018, N.Y. Magazine, available at http://nymag.com/daily/intelligencer/2018/06/separating-families-at-border-was-always-part-of-the-plan.html.

90.     Mr. Miller's anti-Latino animus is well-known and long-standing.  Even in high school he wrote an opinion piece for the Santa Monica Lookout which argued that "very few, if any, Hispanic students" make it to honors classes because the school gives them a "crutch" by ensuring that "all announcements are written in both Spanish and English."  S. Tatum, *How Stephen Miller, the Architect Behind Trump's Immigration Policies, Rose to Power*, June 23, 2018, available at https://www.cnn.com/2018/06/23/politics/stephen-miller-immigration-family-separation/index.html.

91.     Mr. Miller's anti-immigrant and anti-Latino animus has only hardened over the years.  In fact, an outside White House adviser recently stated that "Stephen actually enjoys seeing those pictures at the border" of Central and South American children being separated from their parents.  G. Sherman, *"Stephen Actually Enjoys Seeing Those Pictures at the Border": The West Wing is Fracturing Over Trump's Callous Migrant-Family Policy*, Vanity Fair, June 20, 2018, available at https://www.vanityfair.com/news/2018/06/stephen-miller-family-separation-white-house.

92.     Defendant's employee, Counselor to the Attorney General Gene Hamilton, who has been described as "a close ally of Stephen Miller," was reported to be "[a]mong those leading the discussion" about forcibly separating families in immigration detention at the Southwestern border.  J. Blitzer, *How the Trump Administration Got Comfortable Separating Immigrant Kids from their Parents*, The New Yorker, May 30, 2018, available at

https://www.newyorker.com/news/news-desk/how-the-trump-administration-got-comfortable-separating-immigrant-kids-from-their-parents.

93.     A former government official has reported to the press that Miller and Hamilton, among others, "want to have a different America, and they're succeeding."  Moreover, "Miller has only seemed to gain allies in the government" as a result of his role in pushing for the forcible separation of immigrant children from their parents.  J. Blitzer, *Will Anyone in the Trump Administration Ever Be Held Accountable for the Zero-Tolerance Policy?*, The New Yorker, August 22, 2018, available at https://www.newyorker.com/news/daily-comment/will-anyone-in-the-trump-administration-ever-be-held-accountable-for-the-zero-tolerance-policy.

94.     In public remarks on the "zero tolerance policy" on May 7, 2018, General Sessions emphasized that "[i]f you are smuggling a child, then we will prosecute you and that child will be separated from you as required by law."  Exhibit 2, DOJ Press Release (May 7, 2018).  General Sessions said nothing about reuniting parents with their children once detention ended because he had no intention of doing so.

95.     Later, General Sessions stated:  "We cannot and will not encourage people to bring their children or other children to the country unlawfully by giving them immunity in the process."  L. Sanchez, *Sessions On Separating Families: If We Build A Wall and Pass Legislation, We Won't Have These "Terrible Choices"*, The Hill, June 18, 2018, available at http://thehill.com/homenews/administration/392785-sessions-on-separating-families-if-we-build-a-wall-and-pass.

96.     When asked if forced family separation was "absolutely necessary," General Sessions responded: "Yes. . . . We believe every person that enters the country illegally like that should be prosecuted. And you can't be giving immunity to people who bring children with them

recklessly and improperly and illegally." H. Hewitt, *US Attorney General Jeff Sessions on Children Separated from Parents at Broder, F-1 Visas for PRC Students, and Masterpiece Cakeshop Decision*, June 5, 2018, available at http://www.hughhewitt.com/attorney-general-jeff-sessions-on-the-immigration-policies-concerning-children-apprehended-at-he-border-and-f-1-visas/.

97.     Likewise, Secretary Nielsen has said that "[i]llegal actions have and must have consequences. No more free passes, no more get out of jail free cards." T. Kopan, *"We Will Not Apologize": Trump DHS Chief Defends Immigration Policy*, June 18, 2018, available at https://www.cnn.com/2018/06/18/politics/kirstjen-nielsen-immigration-policy/index.html.

98.     At an August 2017 DHS meeting, Mr. Hamilton explained to participants that they would "need to generate paperwork laying out everything we could do to deter immigrants from coming to the U.S. illegally," which included "separating parents from their kids at the border." J. Blitzer, *How the Trump Administration Got Comfortable Separating Immigrant Kids from their Parents*, The New Yorker, May 30, 2018, available at https://www.newyorker.com/news/news-desk/how-the-trump-administration-got-comfortable-separating-immigrant-kids-from-their-parents.

99.     Counselor to the President Kellyanne Conway also made clear the purpose of Defendant's forcible separation of families: "Nobody likes seeing babies ripped from their mothers' arms . . . but we have to make sure that DHS' laws are understood through the soundbite culture that we live in." *Kellyanne Conway: 'Nobody Likes' Policy Separating Migrant Kids at the Border* (June 17, 2018), available at https://www.nbcnews.com/politics/first-read/conway-nobody-likes-policy-separating-migrant-kids-border-n884016.

100.     General Sessions, Secretary Nielsen, Secretary Kelly, Mr. Miller, Mr. Hamilton, Director Homan and others in the Trump Administration, including the President himself, have also made clear that the forced separation and traumatization of families in immigration detention is being used as a negotiating ploy for political gain.

101.     Mr. Miller has stated:  "If we were to have those [Republican sponsored] fixes in federal law, the migrant crisis emanating from Central America would largely be solved in a very short period of time," and "[f]amilies would then therefore be able to be kept together and could be sent home expeditiously and safely."  T. Hesson, *White House's Miller Blames Democrats for Border Crisis*, Politico, May 29, 2018, available at https://www.politico.com/ story/2018/05/29/stephen-miller-democrats-border-574537 ; *see also* P. Kasperowicz, *ICE Director: Democrats Should "Get Their Facts Straight" Before Protesting Family Separation*, Washington Examiner, June 29, 2018, available at https://www.washingtonexaminer.com/news/ ice-tom-homan-democrats-get-facts-straight-protesting-family-separation.

**Defendant's Employees Were Aware of the Traumatic Harm that Children Would Suffer from Being Forcibly Separated from their Parents, but Defendant's Employees Did It Anyway, and Failed to Provide the Children with Adequate Mental Health Care**

102.     Separation of a young child from his or her parent is a traumatic event that has a devastating impact on the child's psychological well-being.  Children are likely to experience post-traumatic symptoms, such as nightmares and other manifestations of anxiety and depression.  This damage can be permanent, especially where, as here, the child has already experienced other trauma in their home country, on their journey to the United States, or both.

103.     On January 23, 2018, a group of experts in child welfare, juvenile justice, and child development, including the American Association of Pediatrics, criticized the government's separation of migrant children from their parents, pointing out that: "[T]he psychological distress, anxiety, and depression associated with separation from a parent would

25

follow the children well after the immediate period of separation—even after the eventual reunification with a parent or other family." Exhibit 3, Jan. 23, 2018 Letter to K. Nielsen.

104. The American Academy of Pediatrics put out another statement opposing the cruel family separations on May 8, 2018, in which its President, Colleen Kraft, M.D., wrote: "Separating children from their parents contradicts everything we stand for as pediatricians – protecting and promoting children's health. In fact, highly stressful experiences, like family separation, can cause irreparable harm, disrupting a child's brain architecture and affecting his or her short- and long-term health. This type of prolonged exposure to serious stress - known as toxic stress - can carry lifelong consequences for children." C. Kraft, *AAP Statement Opposing Separation of Children and Parents at the Border*, available at https://www.aap.org/en-us/about-the-aap/aap-pressroom/Pages/StatementOpposing SeparationofChildrenandParents.aspx.

105. Media reports have explained that "many of the children released to their parents are exhibiting signs of anxiety, introversion, regression and other mental health issues." M. Jordan, *A Migrant Boy Rejoins His Mother, But He's Not the Same*, N.Y. Times, July 31, 2018, available at https://www.nytimes.com/2018/07/31/us/migrant-children-separation-anxiety.html. This includes "acute anxiety around routines that separate [the children] from their parents, such as when the adult bathes or goes into another room." *Id*.

106. One of the reasons for this is that the children may understand the separation as a punishment. *Id*. "Decades of research have concluded that children traumatically separated from their parents have a high likelihood of developing emotional problems, cognitive delays and long-term trauma." *Id*. "More recent studies have found that separation can impair memory and normal production of cortisol, a hormone produced in response to stress." *Id*.

107. This psychological harm continues after reunification.

108.    One 5-year old migrant boy loved playing with the yellow Minion characters from the "Despicable Me" movies before being forcibly separated from his mother.  "Now his favorite game is patting down and shackling 'migrants' with plastic cuffs."  *Id*.  The boy, who had not nursed in years, pleaded with his mother to be breastfed after he was finally reunited with his mother.  He hid behind a sofa when guests, including undersigned counsel Jesse M. Bless, Esq., visited the family's new home in Philadelphia.  *Id*.

109.    "A 3-year old boy who was separated from his mother has been pretending to handcuff and vaccinate people around him, behavior he almost certainly witnessed in [ICE] custody."  *Id*.

110.    "A pair of young siblings burst into tears when they spotted police officers on the street."  *Id*.

111.    One three-year-old boy refused to look at his mother and pulled away from her embrace when they were initially reunified.  *See* A. Valdes & I. Mejia, *'My Son Is Traumatized': One Separated Family's Reunion*, ACLU Press Release, August 24, 2018, available at https://www.aclu.org/blog/immigrants-rights/immigrants-rights-and-detention/my-son-traumatized-one-separated-familys.

112.    Similarly, parents who arrived with their children at the United States border and were forcibly separated from their children by the Defendant while in immigration detention are likely to experience immediate and acute psychological injury as well as lasting and permanent emotional and psychological harm.  This includes anxiety, depression, post-traumatic stress disorder, and other trauma-related disorders.  The trauma that the children face is compounded by watching their parents suffer and the emotional toll that the parents' own trauma takes on the parent-child relationship.  Making matters worse, the Defendant's employees then failed to

adequately provide the children with necessary mental health care while the children were in Defendant's custody.

113.    Indeed, one parent is reported to have committed suicide after his 3-year-old son was taken from his arms.  N. Miroff, *A Family Separated at the Border, and this Distraught Father Took His Own Life*, Washington Post, June 9, 2018, available at https://www.washingtonpost.com/world/national-security/a-family-was-separated-at-the-border-and-this-distraught-father-took-his-own-life/2018/06/08/24e40b70-6b5d-11e8-9e38-24e693b38637_story.html?utm_term=.dca844c151d9.  This harm to the parents, of course, will impact the quality of their relationship with their children for years to come.

114.    There is no doubt that Defendant was aware of the severe psychological and emotional trauma that forcibly separating children from their parents would cause.  Not only is the likelihood of severe harm self-evident, but Defendant's employees were informed of and warned about the likelihood of such harm directly and through many authoritative public statements by other government officials and experts in the field.

115.    For example, on February 12, 2018, 33 United States Senators signed a letter to Secretary Nielsen to express their "deep concern" about "systematically separat[ing] immigrant children from their parents upon arrival in the United States."  Exhibit 4, Feb. 12, 2018 Letter from U.S. Sens. to Sec. Nielsen.  The Senators wrote to "condemn" forced family separation and to urge Secretary Nielsen to reject this "cruel" and "grotesquely inhumane" conduct that they recognized would "inflict significant trauma on small children."  *Id*.

116.    Moreover, Commander Jonathan White of the United States Public Health Service Commissioned Corps (who organized the government's reunification effort at DHS after a federal court in California ordered reunification in 2018) testified before the Senate Judiciary

Committee on July 31, 2018.   Commander White told the Judiciary Committee "that he had warned his superiors that separating children from their parents carries a 'significant risk of harm' and could inflict 'psychological injury.'"  N. Miroff & K. Memirjian, *Senate Panel Skewers Trump Officials Over Migrant Family Separations*, Wash. Post, July 31, 2018, available at https://www.washingtonpost.com/world/national-security/lawmakers-to-question-trump-officials-on-migrant-family-separations-struggle-to-reunite-them/2018/07/31/ddb61390-9467-11e8-8ffb-5de6d5e49ada_story.html?utm_term=.27575f06d9ea.  Commander White told the Senate panel that his superiors assured him that the government was not planning to separate families.  *Id.*

117.    Even in the face of these clear and direct warnings, the Defendant proceeded to traumatize the class members, and then exacerbated the trauma by failing to provide the children with adequate and necessary mental health services, even though the Defendant knew that the class members needed mental health care to address the trauma that Defendant itself, through its employees, inflicted on the class members.

118.    In the words of a current Trump Administration official: "The expectation was that the kids would go to the Office of Refugee Resettlement, that the parents would get deported, and that **no one would care**."  J. Blitzer, *Will Anyone in the Trump Administration Ever Be Held Accountable for the Zero-Tolerance Policy?*, The New Yorker, August 22, 2018 (emphasis added), available at https://www.newyorker.com/news/daily-comment/will-anyone-in-the-trump-administration-ever-be-held-accountable-for-the-zero-tolerance-policy.

### After Traumatizing Children and Parents, Defendant's Employees Coerced Parents into Waiving Their Children's and Their Own Rights to Asylum and Other Relief

119.    After subjecting parents and children to some of the most severe trauma of their lives, Defendant's employees proceeded to coerce many parents into signing forms that waived

their own and their children's rights to pursue asylum claims in the hope of being reunited with their children more quickly.

120.    A senior official, speaking on condition of anonymity, confirmed that Defendant did not plan to reunite families until after a parent had lost his or her deportation case, effectively punishing parents who may otherwise pursue an asylum claim or other relief, and creating tremendous pressure to abandon such claims so that parents may be reunited with their children. M. Saccheri, M. Miller & R. Moore, *Sen. Warren Visits Detention Center, Says No Children Being Returned to Parents There*, Washington Post, June 24, 2018, available at https://www.washingtonpost.com/local/immigration/desperate-to-get-children-back-migrants-are-willing-to-give-up-asylum-claims-lawyers-say/2018/06/24/c7fab87c-77e2-11e8-80be-6d32e182a3bc_story.html?utm_term=.3118c8f35345.

121.    Parents have been presented with the option to be deported with their children and waive the children's right to asylum, or to be deported alone and leave the child in the United States to pursue an asylum claim.  Some who have chosen to be deported alone to let their children pursue asylum were not even allowed by ICE to say goodbye to their children but had to wave to their children who sat on a bus.  M. Jordan, *Migrant Families Have Been Reunited. Now a Scramble to Prevent Deportations*, N.Y. Times, July 30, 2018, available at https://www.nytimes.com/2018/07/30/us/migrant-families-deportations.html?action=click&module=MoreInSection&pgtype=Article&region=Footer&contentCollection=U.S.

122.    In the past, the government often placed families apprehended at the border in regular removal proceedings without detaining them at all.  For other families, the government used expedited removal procedures and detained members of the families together during these

expedited proceedings.  If the government found these family members to have a credible fear of persecution, they would release the family from detention, because it often takes years before immigration courts can offer asylee applicants a full and fair hearing on the merits of their claims.

123.    Defendant's employees in the Trump Administration are the first to systematically and forcibly separate all fit parents from their young children in immigration detention (even in the absence of criminal charges), refuse to reunify them thereafter until ordered by a federal court to do so, and then double down by coercing parents to waive their own and their children's rights to asylum and other relief.

**DHS Advisory Council Members Resign in Protest of the Defendants' Forced Separation of Children from their Parents in Immigration Detention**

124.    As a result of Defendant's unconstitutional actions, four members of the Department of Homeland Security Advisory Council resigned on July 16, 2018 in protest of the forced separation of children from their parents, writing that "routinely taking children from migrant parents [i]s morally repugnant, counter-productive and ill-considered."  Exhibit 5, July 16, 2018 Letter from R. Danzig, E. Holtzman, D. Martin, and M. Olsen to Sec. K. Nielsen.

125.    Former Congresswoman Elizabeth Holtzman wrote to Secretary Nielsen in her separate individual resignation letter:

> Under your administration and that of Donald Trump's, DHS has been transformed into an agency that is making war on immigrants and refugees. . . . The final straw has been the separation of children from their parents at the Southwest border.  This is child kidnapping, plain and simple.  Seizing children from their parents in violation of the constitutional rights of both is bad enough (mentally harmful to the children and infinitely painful to both the parents and children), but doing so without creating proper records to enable family reunification shows utter depravity on the part of the government officials involved.

Exhibit 6, July 16, 2018 Letter from Hon. E. Holtzman to Sec. K. Nielsen.

126.     Professor David A. Martin wrote to Secretary Nielsen in his own resignation letter about the "unjust" separation of families at the border.  He explained that it was "clear" that the separation of children from their families was "executed with astounding casualness about precise tracking of family relationships – as though eventual reunification was deemed unlikely or at least unimportant, even for toddlers and preschoolers. . . . From the beginning, however, the administration has opted instead for gratuitously severe actions in the immigration arena."  Professor Martin went on to write that the Defendant's forcible separation of children from their families "crystallized for many HSAC members profound doubts about the administration's commitment to the rule of law.  Exhibit 7, July 16, 2018 Letter from Prof. D. Martin to Sec. K. Nielsen.

### Individual Plaintiffs' Allegations – K.O., E.O., Jr., L.J., and E.O.

127.     On May 19, 2018, K.O., E.O., Jr., and their mother L.J. arrived in South Texas, near McAllen, on foot after fleeing from their home country of Guatemala.  The family fled the violence they had experienced in Guatemala and were seeking asylum in the United States.

128.     At the time of their crossing, K.O. was nine years old and E.O., Jr. was seventeen years old.

129.     The family walked alone for about five hours along the Rio Grande, without food or water and in fear of being robbed or attacked by a poisonous snake or other animal.  They hoped that a CBP Agent would find them to allow them to apply for asylum.

130.     Eventually a single CBP Agent stopped the family and told them to remove their jewelry, belts, and shoes.  The CBP Agent made K.O. remove a small ring that she had received upon her Kindergarten graduation.  The CBP Agent asked them if they had any money, telephones, or identification.  L.J. explained that they only had identification.

131.    The CBP Agent then drove the family in a truck for about thirty minutes. Immediately, K.O. and E.O., Jr. felt relieved, believing that help had arrived and they could finally rest.  K.O. fell asleep.

132.    The family was taken to border patrol detention facility L.O. believes was approximately ten minutes away from an immigration detention facility in McAllen, Texas. They were seated on a cement bench.

133.    After a few minutes, CBP Agents called E.O., Jr. into an extremely small room with about fifty other children ranging in age from about fourteen to seventeen.  When E.O., Jr. was taken from L.J., she had no idea that the Defendant's employees intended to keep them separated.

134.    In the first border patrol immigration detention facility, there was not enough space in the room for E.O., Jr. to sit so he had to stand for almost seven hours.  The air became so thick and heavy that some of the children kept calling for the CBP Agents to help by banging on the door.  Every once in a while, the CBP Agents opened the door, which let some air in, and everyone felt momentary relief.  More than once, the CBP Agents opened the door and screamed at the group of children in Spanish: "Shut up, you donkeys!"

135.    L.J. saw her son E.O., Jr. come out of the room once to be fingerprinted.  The CBP Agents would not let E.O., Jr. talk to L.J.  They were terrified.  They did not know why the CBP Agents had separated them.  They feared they would never see each other again.

136.    About two minutes after taking E.O., Jr., CBP Agents took nine-year-old K.O. and her mother to another holding cell.  About thirty other mothers were in that cell with their children.  One mother had an infant that looked to be only two months old.  The room was freezing cold, the only food was sandwiches for the children, and many of the children were

33

crying the entire time.  Mothers walked with their children on their shoulders and sang songs to

them, hoping to help the children fall asleep.

137.    K.O. felt hungry, cold, and afraid in that cell.  L.J. could not do anything to help

her.

138.    About twelve to fourteen hours later, CBP Agents brought L.J. into a room with

about ten other mothers.  Their children were left alone in a cell.  K.O. grabbed L.J. from behind

and said, "Mommy, don't go!"

139.    The CBP Agent had to pry K.O.'s hands off of L.J. and when he did that he yelled

at K.O. in Spanish:  "Dejala!"  That means: "Let her go!"  L.J. asked the agent why he was

attacking K.O.

140.    As the CBP Agent pulled K.O.'s hands off of L.J., he said to her in Spanish:

"You're going to be deported to Guatemala and we're going to adopt your daughter."

141.    K.O. was screaming.  L.J. desperately called out to K.O., telling her:  "I love you

with all my heart!  We are going to see each other again soon.  Remember your father's phone

number."

142.    E.O., Jr. could see this happening through the window of the room where he was

being held.  E.O., Jr. banged on the window to try to stop them from taking his sister, to no avail.

143.    K.O.'s father, E.O., was living in Westborough, Massachusetts and L.J. thought

he would be able to help K.O. even if L.J. could not.  When he found out where they were, E.O.

began trying to get his children released to him in Massachusetts.

144.    On the day the children were suddenly and forcibly taken from L.J. while they

were being held in a border patrol immigration detention facility, a CBP Agent or ICE Agent

called E.O. in Massachusetts.  The officer told E.O., "I have your family here," and continued to

tell E.O. that his children had been separated from their mother, and that the children would be placed in the custody of a social worker.  The officer told E.O. that they intended to separate the children from L.J. and said nothing about reuniting the children with L.J. or with E.O., even though E.O. was already living in Massachusetts.  E.O. spoke to E.O, Jr. briefly, but K.O. was crying too much to talk.

145.    L.J. was never charged with a crime.[1]  She was taken to immigration court in Texas and remained in civil immigration custody.  Defendant's employees had no legitimate interest in keeping K.O. and E.O., Jr. from the custody and care of L.J. while she was being held in immigration detention, particularly where she was never charged with a crime.  There was no evidence or even allegation of abuse, neglect, or unfitness or that L.J. was not acting in the best interests of her children.  Defendant's employees did not provide K.O., E.O., Jr., or L.J. with any notice or opportunity to be heard before forcibly separating them.

146.    K.O. and E.O., Jr. were placed on a bus with no shoes.  E.O., Jr. tried to hug his sister, but the CBP Agents or ICE Agents separated them immediately.  The bus ride was about ten minutes long.  The CBP Agents or ICE Agents then placed the children in a new immigration detention facility with cells facing across from each other.

147.    E.O., Jr. tried to talk to K.O. to tell her not worry and that she would be out of the cells soon.  K.O. asked her brother:  "What happened to Mommy?"

148.    When E.O., Jr. tried to answer, a CBP Agent or ICE Agent yelled at him and instructed him not to talk to his own sister.  Her question went unanswered.

149.    K.O. and E.O., Jr. stayed at that facility for two days and two nights.  The rooms were freezing.  The only blankets they had were silver thermal blankets.

---

[1] The original Complaint alleged that L.J. was indicted for the misdemeanor offense of illegal entry, but Plaintiffs' counsel have since learned that L.J. was not charged with a crime and appeared in immigration court only.

150.    Small children, who appeared to be as young as one or two years old, cried on the floor.  The older children tried to take care of the young, crying children.  Boys and girls were separated by something like a metal fence.

151.    At one point, E.O., Jr. looked over at his sister K.O., and she was crying.  E.O., Jr. put his hands together and put his head on his hands, pretending to sleep, to try to help soothe K.O. and stop her from crying.  But E.O., Jr. felt so helpless that he too started crying.

152.    When the children cried, some CBP Agents or ICE Agents insulted them in Spanish, including by shouting at them: "Shut up, you trash!"

153.    Once, a CBP Agent or ICE Agent came up to E.O., Jr. and asked how old he was. When he replied that he was seventeen years old, the CBP Agent or ICE Agent said "you are lying" and kicked E.O., Jr. about ten times in the back.

154.    The CBP Agents or ICE Agents woke K.O. up to take a shower by pulling her ponytail.

155.    Border patrol agents told E.O., Jr. that he was to be removed from this immigration detention facility first.  He told the CBP Agents or ICE Agents that he had to wait for his sister.  The CBP Agents or ICE Agents said that if he stayed, he would "lose his opportunity."  E.O., Jr. thought they meant that he would lose his opportunity to be reunited with his father, E.O.  E.O., Jr. still refused to leave, unwilling to leave his sister alone.  The next night, the CBP Agents or ICE Agents made E.O., Jr. bathe in cold water, change his clothes, and prepare to leave.

156.    The CBP Agents or ICE Agents took both E.O., Jr. and K.O. to another immigration detention facility.  When E.O., Jr. asked where his mother was, the CBP Agents or ICE Agents told him they had deported his mother.

157.     E.O., Jr. and K.O. were placed on an airplane to Michigan, seated separately. They arrived at about 1:00 a.m., and they were told they were going to separate locations.  E.O., Jr. asked them to allow him to stay with his sister, but CBP Agents, ICE Agents, or ORR Personnel told E.O., Jr. not to worry and assured him that they would bring K.O. back in the morning.

158.     As soon as the siblings were separated, K.O. started to cry.  She was taken to a foster family with three other children who had been forcibly separated from their parents at the border.  There were two six-year-olds and an eight-year-old.

159.     While K.O. was in foster care, she spoke to E.O. every night.  Her foster care family allowed her to call E.O. on his telephone with a Massachusetts area code (508).  K.O. told E.O. that she was scared, and constantly asked about her mother.

160.     E.O., Jr. stayed in a facility with about eighteen other boys.  He attended school in the morning and K.O. was able to see her brother at school.  E.O., Jr. was told by ORR Personnel that getting out of the facility would be a terrible, long process.

161.     K.O. and E.O., Jr. did not know where their mother was.  It bothered E.O., Jr. so terribly that he could not sleep or eat.

162.     E.O., Jr. was told that he had to be vaccinated again, even though he had already been vaccinated, and he was given ten shots by a medical professional and ORR Personnel.  K.O. was also vaccinated and was given nine shots.  L.J. was not there to comfort her daughter during this process.

163.     About five days later, E.O., Jr. was able to call his father, E.O., and tell him where he was being held.

164.    On or after May 20, 2018, E.O. received a Family Reunification Application from the Office of Refugee Settlement by email, received on an email account belonging to his friend who also resided in Westborough, Massachusetts. ORR required E.O. to complete an application for each of his children in order for ORR to release the children into E.O.'s custody.  The applications required E.O. to submit proof of his identify, his address in Westborough, MA, and his parental relationship with K.O. and E.O., Jr.  E.O.'s attorney's paralegal emailed or faxed the applications to ORR sometime after May 21, 2018.

165.    Following the submission of the applications, E.O. was instructed to complete additional paperwork due to errors in the document.  E.O. submitted additional documents to ORR.  He was also interviewed for approximately an hour and a half by ORR representatives while E.O. was at his home in Westborough, MA.

166.    K.O. and E.O., Jr. were finally released and reunited with their father in Massachusetts on June 19, 2018.  ORR personnel or contractors accompanied K.O. and E.O., Jr. from Michigan, through Washington, D.C., to reunite with E.O. in Massachusetts.  E.O. met his children at Logan Airport where he signed paperwork to assume custody of his children.

167.    As a condition of ORR's release of K.O. and E.O., Jr. to E.O's custody, E.O. had to attend a presentation called the "Legal Orientation Program for Custodians," a presentation specific to unaccompanied minors.  E.O. attended the presentation at Catholic Charities in South Boston, Massachusetts, approximately two weeks prior to being reunited with his children.

168.    L.J. spent about eight days in the facility where border patrol took her after her children were taken from her.  L.J. recalls speaking with what she believes is an asylum officer on the phone during this time.  She was not allowed to call her husband, E.O., for about nine

days.  Then she was taken to what she believes is the T. Don Hutto Residential Center, an immigration detention facility, in Taylor, Texas, where she was detained for several weeks.

169.    L.J. was told by what she believes is a deportation officer in mid-June 2018 that she had been found to have had a credible fear of persecution if she were forced to return to Guatemala.

170.    L.J. was finally released on June 26, 2018 and reunited with her family in Massachusetts after that.  They had been separated for about five weeks at that point.  Needless to say, the family was relieved and joyful.

171.    But the trauma caused by this forcible separation endures.  The horrible, painful memories still torment K.O., E.O., Jr., L.J. and E.O.  K.O. wakes up in the middle of the night, crying, wondering if that mean person will pull her hair again.  Whenever L.J. leaves a room, K.O. follows her mother and fears that she will abandon her again.

172.    The guilt that L.J. feels as a mother is overwhelming.  She feels as if she was unable to protect her children.  The trauma that K.O., E.O., Jr., L.J., and E.O. experienced was life-altering, and it will continue to affect their mental and emotional well-being for years to come.

173.    The ordeal that K.O. and E.O., Jr. endured is typical of the experiences suffered by the putative class members.

### Individual Plaintiff's Allegations – C.J. and F.C.

174.    F.C. and his eleven-year-old son, C.J., entered the United States in El Paso, Texas on June 17, 2018 seeking asylum in this country.  They came to the United States for asylum because organized crime members, who worked in concert with the police in Guatemala,

extorted F.C. for money, threatened to kill F.C. and his family, and left them fearing for their lives.

175.     When they crossed the United States border, F.C. saw a CBP vehicle and walked towards it. F.C. was holding C.J.'s hand.  The CBP Agents handcuffed F.C., and both he and C.J. were driven to a border patrol immigration detention center.

176.     When F.C. and C.J. arrived at the detention center, CBP Agents told F.C. that he would be separated from C.J.  F.C. felt "devastated" and "destroyed" upon hearing that CBP Agents planned to separate his son from him.  F.C. spent two days with C.J. trying to be brave for his son.   Internally, F.C. kept thinking that despite his efforts, his son was going to be kidnapped.  C.J. cried a lot.  F.C. tried to calm him down and told him that F.C. would ask the CBP Agents to let them stay together.

177.     The detention facility was very cold. The air conditioner was on the highest setting at all times. F.C. and his son slept on the floor and were given one aluminum blanket to share.  F.C. stayed up trying to cover C.J. with his arms.  C.J. shivered and constantly complained about the cold.

178.     C.J. also complained of hunger.  Both days F.C. and C.J. were given one burrito to share, twice a day.  F.C. asked for more food to share with C.J.  The CBP Agents denied them additional food, saying: "You're not here to get fat."  When F.C. asked for water they told him to use the sink.  This was difficult because there were approximately fifteen people, including six children, and one bathroom.

179.     On June 20, 2018, the CBP Agents woke up F.C. and C.J. in the middle of the night and took them to a processing area.  They told F.C. that C.J. would stay there while F.C. went to what he believes to be criminal court.  The CBP Agents told F.C. that he would be back

after court.  They told C.J. they would be putting him in another room until F.C. returned.  F.C. assumed this would take a very short period of time, and F.C. would soon see C.J.

180.    Instead, F.C. did not see his son again until July 26, 2018—36 days later.

181.    The CBP Agents handcuffed F.C., took him away, and never returned him to the immigration detention facility where he was held with C.J.  F.C. was very worried about C.J. F.C. was held for nine days in a place that he believes was a federal facility because some detainees there were not immigrants.

182.    F.C. asked anyone who would listen: "Where is C.J.?"  "Where has he been taken?"  "How do I get in touch with him?"

183.    F.C. knew how scared C.J. must be and F.C. felt heartbroken that he had not protected his son, especially because that was all F.C. had wanted to do by coming to the United States.

184.    When F.C. went to court he was told that he was there because he had committed the federal crime of coming into the country illegally.  The judge asked F.C. if he wanted to leave C.J. in the United States or take C.J. with him if deported.  F.C. felt sheer terror at being deported without C.J.  F.C. told the judge that no matter what they decided to do, F.C. wanted C.J. to be with him.

185.    F.C. moved next to a second criminal facility where he stayed for approximately two weeks.  The charges against F.C. were dismissed less than three weeks after they were filed. After leaving the criminal facility, F.C. was moved to multiple immigration detention facilities. At every detention center, F.C. asked about C.J.  F.C. persisted until an employee from one of the detention centers finally arranged for him to speak to C.J.  F.C. was never provided an opportunity to be reunited with C.J. after he was transferred back to civil immigration custody.

186.    When F.C. finally spoke to C.J. it was only for five minutes and C.J. cried very hard the entire time.  F.C. told C.J. not to think about the situation and to play and make new friends. The phone call was heartbreaking because C.J. wanted to know when he would see his father again, but F.C. did not have an answer.

187.    On that same day, an employee at the facility asked again if F.C. would authorize C.J. to stay behind if F.C. were to be deported.  F.C. said no.

188.    At some point the CBP Agents turned F.C. over to ICE Agents.  F.C. was very afraid that the ICE Agents would deport C.J. without F.C.  F.C. was worried that C.J. would grow up alone with no family.  F.C. constantly worried about how C.J. was being treated and whether he was safe.

189.    C.J. was held at a facility with many other children similarly separated from their parents. This separation deeply affected C.J.

190.    While at the facility, another child hit C.J. in the eye.  After C.J. told staff about the assault, he noticed that the child who assaulted him went to see a psychologist or mental health doctor, and then C.J. never saw the child again.  That incident made C.J. feel deep fear, because he thought that if he made a mistake, he might disappear too.

191.    At the facility, C.J. was sad and cried a lot because he missed his father.  C.J. kept asking the staff when he would see his father again.  Although C.J. was told that it would be "soon," the days went by without any change.  Eventually, C.J. came to believe he would never see his father again and would be at the facility for many years.

192.    C.J. and F.C. were finally reunited on July 26, 2018, while at an immigration facility in Port Isabel, Texas.  While the relief and joy they both felt at seeing each other again was overwhelming, the harm that Defendant's employees caused to C.J. during the time that he

was separated from his father and in Defendant's employees' custody can never truly be remedied.

193.    F.C. tries to assure C.J. that he will be OK, that he is safe, and that F.C. will never leave him again.

194.    But C.J. now wakes up with nightmares, something that never happened before Defendant's employees forcibly separated him from his father.  Sometimes, C.J.'s nightmares are so bad that he falls out of bed.

195.    Defendant's forcible separation of C.J. from his father has caused extreme emotional and psychological harm.  The trauma that both C.J. and F.C. experienced was life altering and it will continue to affect their mental and emotional well-being for years to come.

196.    The ordeal that C.J. endured is typical of the experiences suffered by the putative class members.

## Class Allegations

197.    This action is properly maintained as a class action under Fed. R. Civ. P. 23(a) and 23(b)(1) and 23(b)(3).

198.    Plaintiffs K.O., E.O., Jr., and C.J. seek to represent a nationwide class consisting of all minor children nationwide who: enter or have entered the United States at or between designated ports of entry; have been or will be separated from a parent or parents by employees of DHS or its sub-agencies (CBP, ICE, or USCIS); and detained by Defendant's employees in ORR custody, ORR foster care, or CBP or ICE custody without a demonstration in a hearing that the parent is unfit or presents a danger to the child.

199.    The class is so numerous that joinder of all members is impracticable.  While the exact number of class members is unknown at this time and can only be ascertained through

appropriate discovery, based on information disclosed in another pending case and government and press reports, the class consists of thousands of children.  *See*, *e.g., Ms. L. v. ICE*, No. 18-CV -0428-DMS-MDD, Joint Status Report (July 26, 2018) (Doc. No. 159); U.S. Dept. of Health & Human Services, Office of Inspector General, *Review of the Dept. of Justices Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Depts. Of Homeland Security and Health and Human Services*, 21-028 (Jan. 2021), available at https://oig.justice.gov/sites/default/files/reports/21-028_0.pdf

200.    The members of the class are readily ascertainable through Defendant's records.

201.    There are questions of law or fact common to the class.  The class members have all been subjected to forcible separation of migrant children from their parents by Defendant's employees while in immigration detention, through abusive and unconscionable measures, and the refusal of Defendant's employees to reunite the children with their parents for no legitimate reason.  All class members have been forcibly separated without an adequate hearing regarding separation.  The common questions of law include whether Defendant's employees' forcible family separation and prolonged seizure constitute claims under the FTCA, including intentional infliction of emotional distress, negligent infliction of emotional distress, false imprisonment, false arrest, assault and battery, negligent supervision, tortious interference with the parent-child relationship, and loss of consortium.

202.    Plaintiffs' claims or defenses are typical of the claims or defenses of the Class.

203.    Plaintiffs have no interests that are averse to or which irreconcilably conflict with the other members of the class.

204.    Plaintiffs are represented by counsel experienced in class action litigation and, in particular, in litigating civil rights claims involving constitutional and statutory violations, tort

claims, and immigration matters.  Plaintiffs' counsel has adequate resources to commit to representing the class.

205.    Plaintiffs will therefore fairly and adequately protect the interests of the class.

206.    This action is properly maintained as a class action under Fed. R. Civ. P. 23(b)(1) because prosecuting separate actions by or against individual class members would create a risk of: (a) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standard of conduct for the party opposing the class; or (b) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

207.    This action is also properly maintained as a class action under Fed. R. Civ. P. 23(b)(3) because the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### Intentional Infliction of Emotional Distress
### (On Behalf of All Plaintiffs)

208.    Plaintiffs incorporate all of the preceding allegations in this Complaint as if fully set forth here.

209.    Defendant's employees intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of their conduct, when they forcibly separated Plaintiffs and other class members from their parents while in civil immigration detention for punitive purposes, threatened to maintain the separation indefinitely, subjected the children to appalling and abusive conditions, and prevented the children from reliable and ready

access to means of communicating with their parents and one another, among other things as alleged in detail above.

210.    The Defendant's conduct was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

211.    As a direct and proximate cause of Defendant's employees' conduct, Plaintiffs and the class members suffered emotional harm and distress of a nature so severe that no reasonable person could be expected to endure it.  Plaintiffs and the class members are entitled to recover any and all economic, non-economic, punitive, and exemplary damages available under the law, plus interest and costs.

212.    Plaintiffs have exhausted administrative remedies by providing written notification of their claims to the appropriate federal agencies by certified mail more than six months ago.  Exhibit 8, Oct. 9, 2018 Letter from D. Vicinanzo to Federal Agencies (with pseudonyms); Exhibit 9, March 13, 2020 Letter from D. Vicinanzo to Federal Agencies (with Plaintiffs' full names, which have been redacted for filing); Exhibit 10, July 7, 2021 Letter from D. Vicinanzo to Federal Agencies (with Plaintiffs' full names, which have been redacted for filing).

## COUNT II

### Negligent Infliction of Emotional Distress
### (On Behalf of All Plaintiffs)

213.    Plaintiffs incorporate all of the preceding allegations in this Complaint as if fully set forth here.

214.    At all times relevant to the allegations in this Complaint, and by virtue of the special relationship existing and created amongst and between Plaintiffs and Defendant by and

through their voluntary undertakings and the common law, Defendant and its employees owed Plaintiffs a duty of care.

215.     As set forth more particularly in the preceding paragraphs, by the various acts and omissions of Defendant's employees and breaches of duties of care as described therein, Defendant's employees unreasonably subjected Plaintiffs and class members to a foreseeable risk of harm by forcibly separating Plaintiff children and other class members from their parents while in civil immigration detention for punitive purposes, threatening to maintain the separation indefinitely, subjecting the children to appalling and abusive conditions, and preventing the children from reliable and ready access to means of communicating with their parents and one another, among other things as alleged in detail above.

216.     As a direct result of the foregoing, Plaintiffs and class members suffered severe mental and emotional harm, distress, and bodily injury, which physically manifested itself through objective physical symptoms of mental and emotional harm.

217.     The above-referenced acts and omissions of Defendant's employees were wanton, malicious, oppressive, and were undertaken with reckless indifference and disregard of the consequences, reckless indifference and disregard for the well-being of Plaintiffs and other class members, warranting an assessment and award of punitive and exemplary damages.

218.     As a direct and proximate cause and result of the Defendant's employees' negligence and breaches of duties of care, Plaintiffs and the class members were caused to suffer and continue to suffer harm and damages, including, but not limited to, mental and emotional distress, bodily injury, and other legally recognized compensatory damages.  Plaintiffs and other class members are entitled to recover any and all economic, non-economic, punitive, and exemplary damages available under the law, plus interest and costs.

219.    Plaintiffs have exhausted administrative remedies by providing written notification of their claims to the appropriate federal agencies by certified mail more than six months ago.  Exhibit 8, Oct. 9, 2018 Letter from D. Vicinanzo to Federal Agencies; Exhibit 9, March 13, 2020 Letter from D. Vicinanzo to Federal Agencies (with Plaintiffs' full names, which have been redacted for filing); Exhibit 10, July 7, 2021 Letter from D. Vicinanzo to Federal Agencies (with Plaintiffs' full names, which have been redacted for filing).


## COUNT III

**False Imprisonment**
**(On Behalf of All Plaintiffs Except E.O. Individually)**

220.    Plaintiffs incorporate all of the preceding allegations in this Complaint as if fully set forth here.

221.    As set forth more particularly in the preceding paragraphs, by the various acts and omissions of John Doe CBP Agents, John Doe ICE Agents, and John Doe ORR Personnel, Defendant caused the unlawful and unprivileged restraint of Plaintiffs' and other class members' personal liberty and right to family integrity while in civil immigration detention by, among other acts and omissions forcibly separating children from their parents and one another.

222.    The above-referenced acts and omissions of Defendant's employees were wanton, malicious, oppressive, and were undertaken with reckless indifference and disregard of the consequences, reckless indifference and disregard for the well-being of Plaintiffs and the class members, warranting an assessment of and award of punitive and exemplary damages.

223.    As a direct and proximate cause and result of their false imprisonment, Plaintiffs and the class members were caused to suffer and continue to suffer harm and damages, including, but not limited to, mental and emotional distress, bodily injury, and other legally

recognized compensatory damages.  Plaintiffs and the class members are entitled to recover any and all economic, non-economic, punitive, and exemplary damages available under the law, plus interest and costs.

224.    Plaintiffs have exhausted administrative remedies by providing written notification of their claims to the appropriate federal agencies by certified mail more than six months ago.  Exhibit 8, Oct. 9, 2018 Letter from D. Vicinanzo to Federal Agencies; Exhibit 9, March 13, 2020 Letter from D. Vicinanzo to Federal Agencies (with Plaintiffs' full names, which have been redacted for filing); Exhibit 10, July 7, 2021 Letter from D. Vicinanzo to Federal Agencies (with Plaintiffs' full names, which have been redacted for filing).

## COUNT IV

### False Arrest
### (On Behalf of All Plaintiffs Except E.O. Individually)

225.    Plaintiffs incorporate all of the preceding allegations in this Complaint as if fully set forth here.

226.    As set forth more particularly in the preceding paragraphs, by the various acts and omissions of John Doe CBP Agents, John Doe ICE Agents, and John Doe ORR Personnel, Defendant caused the false arrest of Plaintiffs and the class members while in civil immigration detention by, among other acts and omissions forcibly separating children from their parents and one another.

227.    The above-referenced acts and omissions of Defendant's employees were wanton, malicious, oppressive, and were undertaken with reckless indifference and disregard of the consequences, reckless indifference and disregard for the well-being of Plaintiffs and the class members, warranting an assessment of and award of punitive and exemplary damages.

228.    As a direct and proximate cause and result of their false arrest, Plaintiffs and the class members were caused to suffer and continue to suffer harm and damages, including, but not limited to, mental and emotional distress, bodily injury, and other legally recognized compensatory damages.  Plaintiffs and the class members are entitled to recover any and all economic, non-economic, punitive, and exemplary damages available under the law, plus interest and costs.

229.    Plaintiffs have exhausted administrative remedies by providing written notification of their claims to the appropriate federal agencies by certified mail more than six months ago.  Exhibit 8, Oct. 9, 2018 Letter from D. Vicinanzo to Federal Agencies; Exhibit 9, March 13, 2020 Letter from D. Vicinanzo to Federal Agencies (with Plaintiffs' full names, which have been redacted for filing); Exhibit 10, July 7, 2021 Letter from D. Vicinanzo to Federal Agencies (with Plaintiffs' full names, which have been redacted for filing).

## COUNT V

### Assault and Battery
### (On Behalf of All Plaintiffs Except E.O. Individually)

230.    The Plaintiffs incorporate all of the preceding allegations in this Complaint as if fully set forth here.

231.    As set forth more particularly in the preceding paragraphs, by the various acts and omissions of John Doe CBP Agents, John Doe ICE Agents, and John Doe ORR Personnel, Defendant intended to cause a reasonable apprehension of imminent and harmful contact and/or actually made intentional and harmful or offensive contact with Plaintiffs and the class members.

232.    The above-referenced acts and omissions of Defendant's employees were wanton, malicious, oppressive, and were undertaken with reckless indifference and disregard of the

consequences, reckless indifference and disregard for the well-being of Plaintiffs and the class

members, warranting an assessment of and award of punitive and exemplary damages.

233.    As a direct and proximate cause and result of the Defendant's employees' assault

and/or battery, Plaintiffs and the class members were caused to suffer and continue to suffer

harm and damages, including, but not limited to, mental and emotional distress, bodily injury,

and other legally recognized compensatory damages.  Plaintiffs and the class members are

entitled to recover any and all economic, non-economic, punitive, and exemplary damages

available under the law, plus interest and costs.

234.    Plaintiffs have exhausted administrative remedies by providing written

notification of their claims to the appropriate federal agencies by certified mail more than six

months ago.  Exhibit 8, Oct. 9, 2018 Letter from D. Vicinanzo to Federal Agencies; Exhibit 9,

March 13, 2020 Letter from D. Vicinanzo to Federal Agencies (with Plaintiffs' full names,

which have been redacted for filing); Exhibit 10, July 7, 2021 Letter from D. Vicinanzo to

Federal Agencies (with Plaintiffs' full names, which have been redacted for filing).

## COUNT VI

### Negligent Supervision
### (On Behalf of All Plaintiffs)

235.    Plaintiffs incorporate all of the preceding allegations in this Complaint as if fully

set forth here.

236.    At all times material, the CBP Agents, ICE Agents, and ORR Personnel were

under the direction, supervision, and control of Defendant, either directly or through its agents.

237.    At all times material, Defendant, either directly or through its agents, negligently

supervised the CBP Agents, ICE Agents, and ORR Personnel when Defendant knew or should

have known that failure to appropriately supervise the CBP Agents, ICE Agents, and ORR

Personnel in their performance of their duties or intervene to stop the forcible separation of families described in the preceding paragraphs would likely result in harm and damages.

238.    The above-referenced acts and omissions of Defendant and its employees were wanton, malicious, oppressive, and were undertaken with reckless indifference and disregard of the consequences, reckless indifference and disregard for the well-being of Plaintiffs and the class members, warranting an assessment and award of punitive and exemplary damages.

239.    As a direct and proximate cause and result of the Defendant's and its employees' negligence and breaches of duties of care, Plaintiffs and the class members were caused to suffer and continue to suffer harm and damages, including, but not limited to, mental and emotional distress, bodily injury, and other legally recognized compensatory damages.  Plaintiffs and the class members are entitled to recover any and all economic, non-economic, punitive, and exemplary damages available under the law, plus interest and costs.

240.    Plaintiffs have exhausted administrative remedies by providing written notification of their claims to the appropriate federal agencies by certified mail more than six months ago.  Exhibit 8, Oct. 9, 2018 Letter from D. Vicinanzo to Federal Agencies; Exhibit 9, March 13, 2020 Letter from D. Vicinanzo to Federal Agencies (with Plaintiffs' full names, which have been redacted for filing); Exhibit 10, July 7, 2021 Letter from D. Vicinanzo to Federal Agencies (with Plaintiffs' full names, which have been redacted for filing).

## COUNT VII

### Tortious Interference with Parent-Child Relationship
### (On Behalf of All Plaintiffs)

241.    Plaintiffs incorporate all of the preceding allegations in this Complaint as if fully set forth here.

242.    Plaintiffs and the class members have a right to establish or maintain a parental or custodial relationship with their children and parents.

243.    As set forth more particularly in the preceding paragraphs, Defendant's employees intentionally interfered with the parental or custodial relationship between the Plaintiffs and the class members and their parents by forcibly separating them from one another and preventing the Plaintiffs and the class member children from returning to the Plaintiff parents and class members' parents, all without privilege or consent.

244.    As set forth more particularly in the preceding paragraphs, by the various acts and omissions of Defendant's employees and breaches of duties of care as described therein, Defendant's employees have caused Plaintiffs and the class members to lose the society, affection, and companionship of their children and parents and suffer harm and damages, including, but not limited to, mental and emotional distress, bodily injury, and other legally recognized compensatory damages.  Plaintiffs and the class members are entitled to recover any and all economic, non-economic, punitive, and exemplary damages available under the law, plus interest and costs.

245.    Plaintiffs have exhausted their administrative remedies by providing written notification of their claims to the appropriate federal agencies by certified mail more than six months ago.  Exhibit 8, Oct. 9, 2018 Letter from D. Vicinanzo to Federal Agencies; Exhibit 9, March 13, 2020 Letter from D. Vicinanzo to Federal Agencies (with Plaintiffs' full names, which have been redacted for filing); Exhibit 10, July 7, 2021 Letter from D. Vicinanzo to Federal Agencies (with Plaintiffs' full names, which have been redacted for filing).

## COUNT VIII

**Loss of Consortium**
**(On Behalf of All Plaintiffs)**

246.    Plaintiffs incorporate all of the preceding allegations in this Complaint as if fully set forth here.

247.    As set forth more particularly in the preceding paragraphs, by the various acts and omissions of Defendant's employees and breaches of duties of care as described therein, Defendant's employees have caused Plaintiffs and class members to lose the society, affection, and companionship of Plaintiffs' and the class members' parents and children and suffer harm and damages, including, but not limited to, mental and emotional distress, bodily injury, and other legally recognized compensatory damages.  Plaintiffs and the class members are entitled to recover any and all economic, non-economic, punitive, and exemplary damages available under the law, plus interest and costs.

248.    Plaintiffs have exhausted their administrative remedies by providing written notification of their claims to the appropriate federal agencies by certified mail more than six months ago.  Exhibit 8, Oct. 9, 2018 Letter from D. Vicinanzo to Federal Agencies; Exhibit 9, March 13, 2020 Letter from D. Vicinanzo to Federal Agencies (with Plaintiffs' full names, which have been redacted for filing); Exhibit 10, July 7, 2021 Letter from D. Vicinanzo to Federal Agencies (with Plaintiffs' full names, which have been redacted for filing).


WHEREFORE, Plaintiffs E.O. and L.J., and K.O. and E.O., Jr. by and through their parents and next friends E.O. and L.J, and F.C. and C.J, by and through his father and next friend F.C., on behalf of themselves and K.O., E.O., Jr., and C.J. on behalf of all others similarly situated, respectfully request that the Court grant the following relief:

    A.  Enter judgment declaring this action to be a class action under Fed. R. Civ. P. 23 and certifying Plaintiffs K.O. and E.O., Jr., by and through their parents and next

friends, E.O. and L.J, and C.J, by and through his father and next friend F.C., as the class representatives and Plaintiffs' counsel as class counsel;

B.  Enter judgment in favor of Plaintiffs and the class, and against Defendant, on all counts of the Complaint;

C.  Enter an order requiring the Defendant to establish a fund in an amount to be determined at trial for the mental health treatment and ongoing mental health monitoring of the class members;

D.  Award to Plaintiffs and the class all economic, non-economic, punitive and exemplary damages in an amount to be determined at trial sufficient to compensate the class for their injuries, including, but not limited to, emotional pain and suffering, mental anguish, embarrassment, and humiliation;

E.  Award to Plaintiffs and the class punitive or exemplary damages as permitted by law;

F.  Award to Plaintiffs and the class their attorneys' fees, costs, and interest as permitted by law; and

G.  Grant such further and other relief as may be just and proper.

**PLAINTIFFS ON BEHALF OF THEMSELVES AND
ALL OTHERS SIMILARLY SITUATED
DEMAND A TRIAL BY JURY ON ALL CLAIMS AND ISSUES SO TRIABLE**

Respectfully submitted,

E.O. and L.J., and K.O. and E.O., Jr. by and through their parents and next friends E.O. and L.J.; F.C. and C.J, by and through his father and next friend F.C.; each individually and K.O., E.O., Jr., and C.J. on behalf of all others similarly situated,

By their attorneys,

 /s/ Joseph M. Cacace
Howard M. Cooper (BBO # 543842)
Joseph M. Cacace (BBO # 672298)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
hcooper@toddweld.com
jcacace@toddweld.com

Susan B. Church (BBO # 639306)
Derege Demissie (BBO # 637544)
DEMISSIE & CHURCH
929 Massachusetts Avenue, Suite 01
Cambridge, MA 02139
(617) 319-2399
sbc@demissiechurch.com
dd@demissiechurch.com

Jeff Goldman (BBO # 548056)
THE LAW OFFICES OF JEFF GOLDMAN LLP
125 Washington Street, Ste. 204
Salem, MA 01970
(781) 704-3897
Jeff@jeffgoldmanimmigration.com

David A. Vicinanzo (*pro hac vice* forthcoming)
Nathan P. Warecki (BBO# 687547)
Lauren Maynard (BBO# 698742)
NIXON PEABODY LLP
53 State Street, Exchange Place
Boston, MA 02109
(617) 345-1000
dvicinanzo@nixonpeabody.com
nwarecki@nixonpeabody.com
lmaynard@nixonpeabody.com

Iván Espinoza-Madrigal (*pro hac vice* forthcoming)
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(617) 988-0624
iespinoza@lawyersforcivilrights.org

Dated:  April 11, 2022

## **CERTIFICATE OF SERVICE**

I, Joseph M. Cacace, hereby certify that this document has been filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

Date:  April 11, 2022

*/s/ Lauren A. Maynard*
Lauren A. Maynard