UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| K.O. and E.O., Jr., by and through their parents and next friends, E.O. and L.J.; and C.J, by and through his father and next friend F.C.;<br><br>            Plaintiffs,<br><br>   v.<br><br>UNITED STATES OF AMERICA,<br><br>            Defendant. | Case No. 4:20-cv-12015-MRG |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO
PRECLUDE PLAINTIFFS FROM INCREASING
THE SUM CERTAIN DEMANDED IN THEIR ADMINISTRATIVE CLAIM**

Plaintiffs seek to hold the United States of America ("Defendant") liable in damages for its employees' inexcusable and tortious conduct in forcibly separating them, among thousands of other young children and parents, from one another while holding them in civil immigration detention. Defendant's employees separated the children from their parents without any factual basis or allegation of abuse, neglect, or unfitness, in the face of known and clear legal duties *not* to do so. Federal officials seized the children and parents, forcibly separated them from one another for unreasonable lengths of time, and inflicted severe emotional harm on them. Defendant did so expressly to send a message about the horror that would greet immigrants, particularly from Central and South American countries, if they dared to seek asylum in the United States: they would lose their children. Through the actions of its employees, the United States severely harmed one of the world's most vulnerable populations, children and parents fleeing violence and poverty.

After failing in its effort to avoid legal accountability for this brutal misconduct, the

Defendant now moves to artificially and prematurely limit the Plaintiffs' potential damages recovery in this action under the Federal Tort Claims Act ("FTCA"), below the amount which the government has recognized is needed to compensate separated families for the harm they have suffered.  The Court should reject Defendant's request.  First, Plaintiffs amended their administrative claim under the FTCA to increase their damages claim from $250,000 to $650,000 per Plaintiff.  Second, the FTCA expressly allows Plaintiffs to seek damages in excess of the amount stated in their claim "based upon **newly discovered evidence not reasonably discoverable at the time of presenting the claim** to the federal agency, or upon **allegation and proof of intervening facts**, relating to the amount of the claim." 28 U.S.C. § 2675(b) (emphasis added).  Plaintiffs should be given the opportunity to do so on a full record, after discovery, at the trial of this matter.  Simply put, it is far too premature to put a ceiling on Plaintiffs' potential recovery now, just as discovery has started and long before trial.  Newly discovered evidence or intervening facts may come to light between now and the trial of this case.  Plaintiffs cannot be precluded from presenting that evidence at trial to increase their damages claim under the FTCA. That is especially so where the government has indicated that individuals separated from their families at the border are entitled to far more than the amount to which Defendant now seeks to limit the Plaintiffs. The Court should deny the Defendant's motion.

## FACTS

### I.    Federal Officials' Tortious Conduct

Defendant's unlawful conduct began in 2017. (First Amended Complaint ("FAC") ¶¶ 36, 44-47, 66, 98).  During the ensuing months, federal officials perpetrated a human crisis by forcibly separating children from their parents.  Some children were torn from their parents' arms while crying and pleading not be taken away; others were told they were going to play and

not returned to their parents; many parents were told their children would be "adopted" and they would never see them again; many parents were deported without their children. (*Id*. ¶¶ 36-57).

The government then withheld the children from the care and custody of their parents even though all were held in immigration detention. (*Id*. ¶¶ 2-7, 36, 40, 58-67, 69, 71, 80-101). Federal officials detained these young, terrified children often thousands of miles from their parents and made it nearly impossible for parents to locate or communicate with their children. (*Id*. ¶¶ 3, 39-42, 58). Children were not allowed to touch each other. (*Id*. ¶ 58). They often had to sleep in areas with no beds or mattresses and were subjected to abuse by the staff at the detention centers. (*Id*. ¶ 59). Medical care was grossly inadequate, causing the death of individuals in the Defendant's care. (*Id*. ¶ 60). These horrific conditions of confinement further traumatized the children and their parents. (*Id*. ¶ 62).

As the FAC alleges, in many cases, federal officials separated children from their parents ***even when the parents were never charged with a crime and were indisputably available in the United States to care for their children at all times***. (*Id*. ¶¶ 5, 71; *id.* ¶¶ 127-73 (K.O. and E.O. family)). When parents were charged with the misdemeanor of illegal entry and released after a brief detention before pleading guilty, the government deliberately kept the parents separated from their children ***even after the parents were transferred back to civil immigration custody***. (*Id*. ¶¶ 5, 38; *id*. ¶¶ 174-96 (F.C. family)). Federal officials *chose* to keep immigrant children from the care and custody of their parents despite the legal obligation to reunite them. Further, even when both child and parent remained in, or were returned to, immigration detention, federal officials refused opportunities to hold them together in existing family detention centers. (*Id*. ¶¶ 4, 5). Defendant's employees coerced many parents into waiving their own and their children's rights to pursue asylum with the promise of a quicker reunification. (*Id*. ¶¶ 43, 119-23).

3

Federal officials separated families to punish and to demonstrate the agony that immigrants—particularly Latino immigrants from Central and South America—should expect if they dared to enter the United States with their children seeking asylum. (*Id*. ¶¶ 2, 68, 80-101).

Defendant attempted to use the so-called "zero-tolerance policy" for prosecuting illegal entry into the United States as pretext to justify and continue separating families, when in fact the separations had started long before the policy went into effect, were not necessary, and were completely unrelated to prosecutorial discretion. (*Id*. ¶¶ 68-79).

Defendant's forced separation of children from their parents caused severe and permanent emotional and psychological harm, particularly because the separated parents and children were already traumatized from the violence and persecution they fled from in their home countries. (*Id*. ¶ 6). Defendant's unreasonable refusal to reunite these children with their parents, who were in immigration detention and available to care for their children, prolonged and significantly increased the trauma suffered by these children. (*Id*. ¶ 7). Federal officials were aware of the traumatic harm that children were suffering but failed to provide these traumatized children with adequate mental health care. (*Id*. ¶¶ 102-118).

## II.     Government Officials' Tortious Conduct Toward the Plaintiffs

### A.     K.O., E.O., Jr., L.J., and E.O.

Plaintiffs K.O., E.O., Jr., and L.J. arrived in South Texas, near McAllen, on foot in May 2018 seeking asylum after fleeing violence in Guatemala. (*Id*. ¶ 127). K.O. was nine and E.O., Jr. was seventeen. (*Id*. ¶ 128). A CBP agent brought the family to a border patrol detention facility near an immigration detention facility in McAllen, Texas. (*Id*. ¶¶ 129-132). E.O., Jr. was separated from his mother, L.J., and sister, K.O., and taken to a small room with about fifty other children in it. (*Id*. ¶ 133). The air was thick and heavy and CBP agents more than once opened

the door and screamed in Spanish: "Shut up, you donkeys!" (*Id*. ¶ 134).  L.J. saw her son come out of the room for fingerprinting but they were not allowed to talk. (*Id*. ¶ 135).

K.O. and L.J. were taken to a holding cell with about thirty other mothers and their children, including an infant who appeared to be two-months old. (*Id*. ¶ 136).  The room was freezing cold, with very little food, and many of the children cried the entire time. (*Id*.)  L.J. was led out of the room and K.O. was left behind. (*Id*. ¶ 138).  K.O. grabbed L.J. from behind and said, "Mommy, don't go!" (*Id*.)  The CBP Agent pried K.O's hands off of her mother and yelled "Let her go!" in Spanish. (*Id*. ¶ 139).  The CBP Agent threatened L.J. with deportation and said that her daughter would be "adopted." (*Id*. ¶ 140).  K.O. was screaming and L.J. cried out: "I love you with all my heart!  We are going to see each other again soon.  Remember your father's phone number." (*Id*. ¶ 141).  E.O., Jr. looked on helplessly from a separate room. (*Id*. ¶ 142).

K.O. and E.O., Jr. were eventually moved to separate facilities in Michigan. (*Id*. ¶¶ 157-160).  During their separation and detention, they were kept in freezing cold rooms with only silver thermal blankets for warmth. (*Id*. ¶¶ 146-55).  When the children in these facilities cried, some CBP or ICE Agents insulted them by shouting: "Shut up, you trash!" (*Id*. ¶ 152).  CBP or ICE Agents kicked E.O, Jr. in the back ten times and pulled K.O.'s hair to wake her up. (*Id*. ¶¶ 153-54).  The separation bothered E.O., Jr. so much that he could not sleep or eat. (*Id*. ¶ 161).

The government does not dispute that K.O and E.O., Jr.'s father, E.O., was living in Westborough, Massachusetts at the time, and was available to care for his children. (*Id*. ¶ 143).  But that did not deter Defendant from separating K.O. and E.O., Jr. from their mother and keeping the children apart from both of their parents for a month. (*Id*. ¶ 166).  During that time, E.O. tried to get his children back. (*Id*. ¶¶ 144, 164-65).  On the day that K.O. and E.O., Jr. were forcibly taken from their mother while in immigration detention, a federal official called E.O. in

Massachusetts and told him: "I have your family here." (*Id*. ¶ 144). The official told E.O. that his children had been separated from their mother and would be placed in the custody of a social worker—even though their father was available to care for them in Massachusetts. (*Id*.) E.O. spoke to E.O., Jr. briefly, but K.O. was crying too much to talk. (*Id*.)

Importantly, L.J. was *never charged with a crime*—contrary to the statements in Defendant's brief. (*Id*. ¶ 145). She was taken to immigration court in Texas and remained in civil immigration custody; she was *never in criminal detention*. (*Id*.) Defendant had no legitimate interest in keeping K.O. and E.O., Jr. from the custody and care of L.J. while she was held in immigration detention without ever being charged with a crime. (*Id*.) There was no allegation of abuse, neglect, or unfitness, yet Defendant never gave K.O., E.O., Jr., or L.J. any notice or opportunity to be heard before federal officials forcibly separated them. (*Id*.)

K.O. and E.O., Jr. were finally released to their father in Massachusetts in June 2018. (*Id*. ¶¶ 143, 166). L.J. was told in mid-June 2018 that the Defendant found she had a credible fear of persecution if she were returned to Guatemala. (*Id*. ¶ 169). L.J. was finally reunited with her family in Massachusetts at the end of June 2018 after about *five weeks* of separation. (*Id*. ¶ 170).

The trauma caused by this forcible separation endures. The memories torment K.O, E.O., Jr., and their parents. K.O. began waking up in the middle of the night, crying, wondering if that mean person would pull her hair again. Whenever L.J. left a room, K.O. followed her and feared being abandoned again. (*Id*. ¶ 171). The ordeal that K.O. and E.O., Jr. endured will continue to affect their mental and emotional well-being for years. (*Id*. ¶¶ 172-73).

### B.      C.J. and F.C.

F.C. and his then eleven-year-old son, C.J., entered the United States in El Paso, Texas on June 17, 2018, seeking asylum from violence in Guatemala. (*Id*. ¶ 174). CBP Agents detained

F.C. and C.J. at an immigration detention center. (*Id*. ¶¶ 175-76).  C.J. spent two days with his father before being separated.  C.J. cried a lot, fearing the separation. (*Id*. ¶ 176).  The detention facility was very cold and F.C. and C.J. slept on a floor with only one aluminum blanket to share. (*Id*. ¶ 177).  C.J. shivered constantly and complained of hunger. (*Id*. ¶¶ 177-78).  F.C. and C.J. were given one burrito to share twice a day, when F.C. asked for more food, the CBP Agents responded: "You're not here to get fat." (*Id*. ¶ 178).  F.C. and C.J. were forced to use the sink for water, which was hard because there was only one bathroom for about fifteen people. (*Id*.)

On June 20, 2018, CBP Agents woke F.C. and C.J. up in the middle of the night and told F.C. that C.J. would stay there while F.C. was taken to what he believes was criminal court. (*Id*. ¶ 179).  The CBP Agents told F.C. that he would return after criminal court and told C.J. that they would put him in another room until his father returned. (*Id*.)  F.C. did not see C.J. again until July 26, 2018—*36 days* later. (*Id*. ¶ 180).  F.C. was moved to another federal detention facility for about two weeks before he was moved into immigration detention and shuttled around to different facilities—without being reunited with C.J. (*Id*. ¶ 181-85).  The charges against F.C. were dismissed less than three weeks after they were filed. (*Id*. ¶ 185).  Yet, even after F.C. was transferred back to civil immigration custody, he was not reunited with C.J. (*Id*.)

When F.C. finally had an opportunity to speak to C.J., it was only for five minutes, and C.J. cried very hard the whole time.  F.C. told C.J. to try to play and make new friends, but it was heartbreaking not knowing when or if he would be reunited with his son. (*Id*. ¶ 186.)  F.C. was asked at least twice if he would authorize C.J. to stay behind if F.C. were to be deported, but F.C. declined. (*Id*. ¶¶ 184, 187).  The separation deeply affected C.J.—he was consumed by fear and sadness. (*Id*. ¶¶ 189-91).  C.J. kept asking when he would see his father again and he eventually came to believe that he never would. (*Id*. ¶ 191).

C.J. and F.C. were finally reunited on July 26, 2018, but the harm that Defendant caused to C.J. is severe. (*Id*. ¶¶ 192-96).  C.J. began waking up with nightmares—some of which were so bad that he fell out of bed. (*Id*. ¶ 194).  C.J. never experienced severe nightmares before Defendant separated him from his father. (*Id*.)  The trauma that C.J. endured will continue to affect his mental and emotional well-being for years. (*Id*. ¶¶ 195-96).

## **PROCEDURAL HISTORY**

## I.    **Plaintiffs' Administrative Claims Under the FTCA**

Plaintiffs submitted their initial FTCA administrative claim to the relevant agencies on October 9, 2018. (ECF No. 41-8.) That claim explained that "[t]he damages for the harm that Claimants have already endured, together with the costs of long-term treatment that will be required to mitigate their emotional suffering, totals approximately $250,000 per Claimant." *Id*. Plaintiffs submitted their first amended administrative claim on March 13, 2020, which included the same amount of claimed damages. (ECF No. 41-9.) Plaintiffs submitted their second amended administrative claim on July 7, 2021. (ECF No. 41-10.) That claim explained that "[t]he damages for the harm that Claimants have already endured, together with the costs of long-term treatment that will be required to mitigate their emotional suffering, totals approximately $650,000 per Claimant." (*Id*.) Plaintiffs increased their monetary demand to ensure they would be compensated for all the harm they had suffered at the hands of the Defendant. The government did not respond on the merits to any of the Plaintiffs' administrative claims. Instead, the Plaintiffs' claims were largely ignored.[1]

---

[1] Defendant recites an account of the claims and amended claims filed by Plaintiffs and their parents in its motion. (Mem., at 4-5 (ECF No. 95).) This account includes the phrase "after the amended administrative claim was denied," implying that Defendant took some action in reliance upon the claims to either value or resolve Plaintiffs' claims. No such evidence has been produced by Defendant, and the inference is not supported by the record.

Throughout most of 2021, Defendant engaged in settlement negotiations aimed at globally resolving, on a nationwide basis, tort claims for money damages against the United States arising out of family separations at the border. Pending lawsuits, including this one, were repeatedly stayed or deadlines extended to allow for these negotiations to continue. (ECF Nos. 19-29) When Defendant abruptly withdrew from those negotiations at the end of 2021 in light of political backlash, several major news outlets reported publicly that Defendant "was considering paying about $450,000 *to each person* affected by the policy." (Emphasis added)[2] In other words, Defendant itself has recognized that the harm to each person affected by family separation far exceeds the $250,000 to which it is seeking to hold Plaintiffs now.

## II.     This Litigation Under the FTCA

Plaintiffs filed the original Complaint in this action on November 9, 2020. (ECF No. 1) After the Defendant moved to transfer or dismiss the Complaint on February 28, 2022 (ECF No. 33), Plaintiffs filed their First Amended Complaint on April 11, 2022. (ECF No. 41) Defendant again moved to transfer or dismiss (ECF No. 50). On January 9, 2023, this Court (Hillman, J.) denied the Defendant's motion to transfer, and denied most aspects of Defendant's motion to dismiss (leaving intact the children's claims, but dismissing the parents' claims as untimely). (ECF No. 72) The Defendant filed its Answer to the First Amended Complaint on March 2, 2023. (ECF No. 81) Defendant filed the present Motion on May 8, 2023. (ECF No. 95)

---

[2] B. Fox, "U.S. Pulls Out of Settlement Talks in Family Separation Suits," *AP News* (Dec. 16, 2021), available at https://apnews.com/article/immigration-lawsuits-american-civil-liberties-union-c1a672b1210fb47c469506ac075c4757; M. Jordan, "Justice Department Halts Settlement Talks with Migrant Families," *New York Times* (Dec. 16, 2021), available at https://www.nytimes.com/2021/12/16/us/biden-migrant-family-separation-settlement.html.

## ARGUMENT

**I.    Applicable Law Under the FTCA**

While FTCA claimants must specify their damages in a "sum certain" (which Defendant concedes Plaintiffs have done), the FTCA permits plaintiffs to amend their administrative claims (28 C.F.R. § 14.2(c)), and to seek damages *in excess* of the claimed amount. The FTCA provides in relevant part:

> Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, **except** where the increased amount is based upon **newly discovered evidence not reasonably discoverable at the time of presenting the claim** to the federal agency, or upon **allegation and proof of intervening facts**, relating to the amount of the claim.

28 U.S.C. § 2675(b) (emphasis added). Under this provision, Plaintiffs may seek damages at trial in excess of the "sum certain" demanded in their administrative claims if Plaintiffs can prove at trial either: (1) newly discovered evidence, or (2) intervening facts, relating to the amount of the claim.

The First Circuit has explained that "we approach[ ] the notice requirement leniently, recognizing that individuals wishing to sue the government must comply with the details of the law, but also keeping in mind that the law was not intended to put up a barrier of technicalities to defeat their claims." *Holloway v. United States*, 845 F.3d 487, 490 (1st Cir. 2017) (cleaned up) (quoting *Santiago–Ramírez v. Sec'y of Dept. of Def.*, 984 F.2d 16, 19 (1st Cir. 1993)). *See also Lopez v. United States*, 758 F.2d 806, 809 (1st Cir. 1985).  "[W]hat matters is whether the plaintiff timely specified a sum certain on the SF 95 or otherwise timely provided documents from which a sum certain could be ascertained." *Holloway*, 845 F.3d at 491.

**II.    Plaintiffs Amended their Administrative Claims Under the FTCA to Increase the Amount of their Damages Claim**

Defendant's argument proceeds from the false premise that Plaintiffs did not amend their

administrative claim to increase the amount of their demand. In fact, Plaintiffs did amend their administrative claims, for a second time, on July 7, 2021 and increased their demand for damages from $250,000 to $650,000 per claimant. (ECF No. 41-10) *Cf.* 28 C.F.R. § 14.2(c). To be sure, Plaintiffs had already filed this action at the time they submitted their second amended FTCA claim increasing the sum certain of their demand to $650,000 per claimant. But the second amended FTCA claim put the relevant agencies on notice of the increased claim. And that occurred at a time when, as publicly reported in late 2021, Defendant itself recognized that Plaintiffs should be entitled to as much as $450,000 each. The Defendant had well over six months between Plaintiffs' filing of the second amended FTCA claim on July 7, 2021, *see* ECF No. 41-10, and the Defendant's filing of its response to the original Complaint (a motion to dismiss) on February 28, 2022, *see* ECF No. 33. *See* 28 U.S.C. § 2675(a) (giving federal agencies six months to respond to FTCA claims). That was more than enough time for the relevant agencies to respond to Plaintiffs' second amended FTCA claim. That Defendant chose not to respond to the second amended FTCA claim, and instead (unsuccessfully) moved to dismiss this action, does not preclude Plaintiffs from amending their administrative claim and seeking the full $650,000 set forth in their second amended FTCA claim.[3]

III. **The FTCA Expressly Permits Plaintiffs to Prove Damages in Excess of the Amount Specified in their Administrative Claim if they Prove Newly Discovered Evidence or Intervening Facts at Trial**

Even if the Court concludes that the amendment was ineffective, Defendant's Motion should be denied because it is inconsistent with the plain language of the statute and premature at

---

[3] Defendant relies on this Court's (Hillman, J.) decision on the Motion to Transfer and Motion to Dismiss in support of its argument, but Judge Hillman's order addressed *only* the *timeliness* of the Plaintiffs' *parents'* administrative claims under the FTCA. Order at 8-11 (ECF No. 72) Judge Hillman's order had nothing to do with the amount demanded in Plaintiffs' administrative claim.

this stage of the case, when discovery is just beginning and long before trial. As explained above, Plaintiffs may seek damages at trial in excess of the "sum certain" demanded in their administrative claims if Plaintiffs can prove at trial either: (1) "newly discovered evidence not reasonably discoverable at the time of presenting the claim," or (2) "intervening facts," relating to the amount of the claim. 28 U.S.C. § 2675(b); *see also Corte-Real v. United States*, 949 F.2d 484, 487 (1st Cir. 1991) ("Any attempt by plaintiff to claim an amount in excess of [her administrative demand] . . . could only be based on the exceptions for 'newly discovered evidence' or 'allegation and proof of intervening facts' as provided in § 2675(b).").

"[T]he amount sought **can** act as a ceiling on the plaintiff's eventual recovery," *Reilly v. United States*, 863 F.2d 149, 170 (1st Cir. 1988) (emphasis added), but only if one of those two exceptions is not met. "[A] determination of what constitutes 'newly discovered evidence not reasonably discoverable' in any particular case is the sort of fact-specific conclusion which demands a substantial degree of deference to the trial court," and which should be made on a full record after trial (or at least after discovery)—not before discovery has even begun. *Id.* at 171. Instead, the standard articulated by the First Circuit in *Reilly* is whether "'some new and previously unforeseen [and material] information came to light' **between the time of filing the administrative claim and the trial on damages**." *Id* at 171 (emphasis added) (quoting *O'Rourke v. Eastern Air Lines, Inc.*, 730 F.2d 842, 856 (2d Cir. 1984)).

Defendant seeks to cut off Plaintiffs' ability to do that before discovery has even really begun. There is no basis for such a premature limit to be put on Plaintiffs' ability to seek a remedy in this case under the FTCA. Tellingly, Defendant cites no case granting a request to limit an FTCA plaintiff's damages at such an early stage. Indeed, even where such motions are granted, they are typically brought and ruled upon no sooner than shortly before trial, after the

plaintiff has had an opportunity to take discovery and develop evidence of "newly discovered" facts or "intervening facts" to come within one of the exceptions in Section 2675(b). *See, e.g.*, *Reilly*, 863 F.2d at 170-73 (reducing damages award after trial where plaintiff never amended her administrative claim to increase it); *Lowry v. United States*, 958 F. Supp. 704 (D. Mass. 1997) (denying motion to amend ad damnum clause just before trial); *Torres v. United States*, No. 5:21-CV-04953, 2022 WL 2115996, at *1 (E.D. Pa. June 13, 2022) (motion to limit damages filed and granted just before trial); *Singletary v. United States*, No. CIVA 05-4000, 2006 WL 3240769, at *1 (E.D. La. Nov. 6, 2006) (same). And that makes sense. After all, many things can come to light or occur during discovery that could qualify as "newly discovered evidence" or "intervening facts," including evidence about the Defendant's conduct or new injuries (whether physical or psychological) that did not manifest before the administrative claim was presented. That is precisely why motions such as this should not be filed or ruled upon at such an early stage.

The cases that Defendant does cite also do not support the relief that Defendant seeks. *Reilly* was decided *after trial*, and it involved a situation where—unlike here—the plaintiff "never amended" her FTCA demand.  *Reilly*, 863 F.2d at 171. The other cases that Defendant cites for general language about FTCA claims involve situations where *no damages amount* was specified in the plaintiffs' administrative FTCA claims. *See Holloway v. United States*, 845 F.3d 487, 490 (1st Cir. 2017) (plaintiff "fail[ed] to fill out the box for a sum certain"); *Coska v. United States*, 114 F.3d 319, 321 (1st Cir. 1997) ("Neither letter set forth the amount of damages being claimed."); *Kokotis v. U.S. Postal Serv.*, 223 F.3d 275, 277 (4th Cir. 2000) (plaintiff "failed to demand a sum certain until four months after the two-year statute of limitations had expired"). Those cases have no application here, where it is undisputed that Plaintiffs submitted FTCA

claims that initially included the amount of $250,000, and where Plaintiffs later amended those claims to increase the amount to $650,000.

Further, Defendant is incorrect that the total amount of damages must be "lock[ed] in" now to "guid[e] settlement discussions" and "structure the scope of discovery." (Mem. at 2 (ECF No. 95).) As to settlement discussions, Defendant asserts no prejudice (nor could it, particularly in light of its recognition in late 2021 that Plaintiffs are entitled to far more than $250,000 each), and there is nothing unusual about the parties to litigation maintaining divergent views as to the amount of a potential damages award. Of course, differing views of potential damages will impact any settlement negotiations between the parties, but that is no reason to artificially and prematurely preclude Plaintiffs from seeking relief for the full scope of the harm they have suffered at the hands of the Defendant and its employees and agents. This is particularly so because there is no evidence or representation by Defendant that it has taken any action whatsoever in reliance upon any "sum certain" set forth in the Plaintiffs' claim notices. What is more, even if the Court were to agree with Defendant that the operative FTCA claim is the first amended claim for $250,000, Plaintiffs could still prove a higher damages amount at trial based upon "newly discovered evidence" or "intervening facts." So, an artificial and premature limit will not aid the parties in any settlement negotiations.

Finally, locking in a sum certain will have no impact on the scope of discovery in this case. Indeed, "[a] plaintiff [is] free at trial to present proof of damages exceeding th[e] amount" of her administrative claim under the FTCA. *Martinez v. United States*, 780 F.2d 525, 530-31 (5th Cir. 1986); *see also Dickens v. United States*, 545 F.2d 886, 893 (5th Cir. 1977) ("the statute does not prevent proof of damages in excess of the amount of the administrative claim"). Plaintiffs intend to seek discovery and present evidence at trial concerning the full extent of the

14

harm that Defendant caused through its traumatizing, tortious actions. An artificial and premature cap on the ultimate damages award in this case will therefore have no impact on the scope of discovery. And while proportionality under Fed. R. Civ. P. 26(b)(1) depends in part on "the amount in controversy," several other factors under Rule 26 will weigh more heavily here in determining the appropriate scope of discovery, including "the importance of the issues at stake in the action," "the parties' relative access to relevant information," "the parties' [relative] resources," "the importance of the discovery in resolving the issues," and a weighing of "whether the burden or expense of the proposed discovery outweighs its likely benefit." That the parties may disagree and be unable to reach "common ground in deciding what counts as proportional discovery," *see* Mem. at 7 (ECF No. 95), is of no moment. Indeed, as the Court noted during the recent status conferences in this matter, that is precisely what the Court is here for: resolving disputes between the parties. In sum, the outcome of this Motion will not impact the scope of discovery.

## **CONCLUSION**

For all these reasons, the Court should reject the Defendant's attempt artificially and prematurely to limit Plaintiffs from recovering for the full extent of the trauma and harm they have suffered at the hands of the Defendant. The Court should deny the Defendant's Motion.

Respectfully submitted,

K.O. and E.O., Jr., by and through their parents and next friends, E.O. and L.J.; and C.J, by and through his father and next friend F.C.,

By their attorneys,

Date:  May 22, 2023

        */s/ Joseph M. Cacace*
Howard M. Cooper (BBO # 543842)
Joseph M. Cacace (BBO # 672298)
Keval D. Kapadia (BBO #709323)
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626
hcooper@toddweld.com
jcacace@toddweld.com
kkapadia@toddweld.com

David A. Vicinanzo (*pro hac vice*)
Nathan P. Warecki (BBO# 687547)
Lauren Maynard (BBO# 698742)
NIXON PEABODY LLP
53 State Street, Exchange Place
Boston, MA 02109
(617) 345-1000
dvicinanzo@nixonpeabody.com
nwarecki@nixonpeabody.com
lmaynard@nixonpeabody.com

Susan B. Church (BBO # 639306)
Derege Demissie (BBO # 637544)
DEMISSIE & CHURCH
929 Massachusetts Avenue, Suite 01
Cambridge, MA 02139
(617) 319-2399
sbc@demissiechurch.com
dd@demissiechurch.com

Jeff Goldman (BBO # 548056)
THE LAW OFFICES OF JEFF GOLDMAN LLP
125 Washington Street, Ste. 204
Salem, MA 01970
(781) 704-3897

16

Jeff@jeffgoldmanimmigration.com

Iván Espinoza-Madrigal (*pro hac vice* forthcoming)
Lawyers for Civil Rights
61 Batterymarch Street, 5th Floor
Boston, MA 02110
(617) 988-0624
iespinoza@lawyersforcivilrights.org

<u>**CERTIFICATE OF SERVICE**</u>

I, Joseph M. Cacace, hereby certify that this document has been filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

*/s/ Joseph M. Cacace*

Date:  May 22, 2023                    Joseph M. Cacace

17